fixed-rate motgages have had significantly lower delinquency rates than 2-28 and 3-27 ARMs, suggesting these mortgages are more likely to be affordable to consumers. In addition, mortgages   [*44555]   designed to have longer life spans create less opportunity for flipping and other abuses, and the borrowers offered these loans may be less vulnerable to abuse. These borrowers have had higher credit scores and therefore more options, and their preference for a longer-lived loan may imply that they have a longer-term perspective and a more realistic assessment of their situation. In fact, a smaller proportion of borrowers with subprime fixed-rate mortgages with penalty provisions originated between 2000 and 2005 prepaid in the first two years (about 35 percent) than did borrowers with subprime 2-28 ARMs with penalty provisions (about 55 percent). n88 Therefore, in the case of shorter prepayment penalty provisions on loans structured to have longer life spans, the Board does not conclude at this time that the injuries from these provisions outweigh the benefits.

n86 *Effect of Prepayment Penalties* 43. *See also Cost-Benefit Analysis* 24 (finding the total estimated interest rate savings for fixed-rate loans to be 51 basis points for retail-originated loans and 33 basis points for broker-originated loans).

n87 *Prepayment Fees Lower Rates* 5. *See also Why Prepayment Penalties Are Good* 25 & fig. 4 (finding that, depending on the borrower's FICO score, fixed-rate loans with prepayment penalties had interest rates that were about 50 basis points (where FICO score 680 or higher) to about 70 basis points (where FICO score less than 620) lower than mortgages without prepayment penalties); *but see No Interest Rate Benefit* (finding, for subprime fixed-rate loans, that interest rates for purchase loans with a prepayment penalty were between 39 and 51 basis points higher than for such loans without a penalty and that for refinance loans there was no statistically significant difference in the interest rates paid).

n88 Figures calculated from First American LoanPerformance data. About 90 percent of the penalty provisions on the fixed-rate loans applied for at least two years.

The Final Rule

For both higher-priced mortgage loans and HOEPA loans, the final rule prohibits prepayment penalties if periodic payments can change during the first four years following loan consummation. For all other higher-priced mortgage loans and HOEPA loans, the final rule limits the prepayment penalty period to two years after loan consummation and also requires that a prepayment penalty not apply if the same creditor or its affiliate makes the refinance loan. For HOEPA loans, the final rule retains the current prohibition of prepayment penalties where the borrower's DTI ratio at consummation exceeds 50 percent; the Board is not adopting this prohibition for higher-priced mortgage loans. The final rule sets forth the foregoing prepayment penalty rules in two separate sections: For HOEPA loans, in § 226.32(d)(7), and for higher-priced mortgage loans, in § 226.35(b)(3).

TILA Section 129(c)(2)(C), 15 U.S.C. 1639(c)(2)(C), limits the maximum prepayment penalty period with HOEPA loans to five years following consummation. The Board proposed to apply this HOEPA provision to higher-priced mortgage loans. Commenters generally stated that a five-year maximum prepayment penalty period was too long. Some consumer organizations, an association of credit unions, and a federal banking regulatory agency recommended a two-year limit on prepayment penalty periods. A few consumer organizations recommended a one-year maximum length. Although a financial services trade association supported a five-year maximum, several financial institutions and mortgage banking trade associations and a government-sponsored enterprise stated that three years would be an appropriate maximum period for prepayment penalties with higher-priced mortgage loans.

As discussed above, the Board concludes that the injuries from prepayment penalty provisions that consumers cannot reasonably avoid outweigh these provisions' benefits with respect to higher-priced mortgage loans and HOEPA loans structured to have short expected life spans. Accordingly, the final rule prohibits a prepayment penalty provision with a higher-priced mortgage loan or a HOEPA loan whose payments may change during the first four years following consummation. n89 A four-year discount period is not common, but a three-year period was common at least until recently. Using a three-year period in the regulation, however, might simply encourage the market to structure loans with discount periods of three years and one day. Therefore, the Board adopts a four-year period in the final rule as a prophylactic measure.

n89 This rule is stricter than HOEPA's statutory provision on prepayment penalties for HOEPA loans. This provision permits such penalties under certain conditions regardless of a potential payment change within the first four years. Section 129(l)(2) authorizes the Board, however, to prohibit acts or practices it finds to be unfair or deceptive in connection with mortgage loans--including HOEPA loans. Since HOEPA's restrictions on prepayment penalty provisions

73 FR 44522, *

were adopted, much has changed to make these provisions more injurious to consumers and these injuries more difficult to avoid. The following risk factors became much more common in the subprime market: ARMs with payments that reset after just two or three years; securitization of subprime loans under terms that reduce the originator's incentive to ensure the consumer can afford the loan; and mortgage brokers with hidden incentives to "push" penalty provisions.

The prohibition applies to loans with potential payment changes within four years, including potential increases and potential declines; the prohibition is not limited to loans where the payment can increase but not decline. The Board is concerned that such a limitation might encourage the market to develop unconventional repayment schedules for HOEPA loans and higher-priced mortgage loans that are more difficult for consumers to understand, easier for origina-tors to misrepresent, or both. The final rule also refers specifically to periodic payments of principal or interest or both, to distinguish such payments from other payments, including amounts directed to escrow accounts. Staff commentary lists examples showing whether prepayment penalties are permitted or prohibited in particular circumstances where the amount of the periodic payment can change. The commentary also provides examples of changes that are not deemed payment changes for purposes of the rule. n90

n90 As discussed above, the final rule sets forth the prepayment penalty rules in two separate sections. For HOEPA loans, § 226.32(d)(7) lists conditions that must be met for the general penalty prohibition in § 226.32(d)(6) not to apply. For higher-priced mortgage loans, § 226.35(b)(2) prohibits a penalty described in § 226.32(d)(6) unless the conditions in § 226.35(b)(i) and (ii) are met. To ensure consistent interpretation of the separate sections, the staff commentary to § 226.35(b)(2) cross-references the payment-change examples and exclusions in staff commentary to § 226.32(d)(7). The examples in staff commentary to § 226.32(d)(7)(iv) refer to a condition that final § 226.35(b)(2) does not include, how-ever--the condition that, at consummation, the consumer's total monthly debt payments may not exceed 50 percent of the consumer's monthly gross income. The staff commentary to § 226.35(b)(2) clarifies this difference.

With respect to loans structured to have longer expected life spans, the Board concludes that the injuries from pre-payment penalty provisions that are short relative to the expected life span are closer to being in balance with their ben-efits. Accordingly, for loans for which the payment may not change, or may change only after four or more years, the Board is not banning prepayment penalties. Instead, it is seeking to ensure the benefits of penalty provisions on these loans are in line with the injuries they can cause by limiting the potential for injury to two years from consummation.

The Board recognizes that creditors may respond by increasing interest rates, up-front fees, or both, and that some subprime borrowers may pay more than they otherwise would, or not be able to obtain credit when they would prefer. The Board believes these costs are justified by the benefits of the rule. Based on available studies, the expected increase in costs on the types of loans for which penalty provisions are prohibited is not large. For the remaining loan types, re-ducing the allowable penalty period from the typical three years to two years should not lead to significant cost increas-es for subprime borrowers. Moreover, to the extent cost increases come in the form of higher rates or fees, they will be reflected in the APR, where they may be more transparent to consumers than as a prepayment penalty. Thus, it is not clear that the efficiency of market pricing would decline.

The Board is not adopting the suggestion of some commenters that it set a maximum penalty amount. A restriction of that kind does not appear necessary or warranted at this time.  [*44556]

*Sixty-day window.* The Board does not believe that the proposed requirement that a prepayment penalty period ex-pire at least sixty days before a potential payment increase would adequately protect consumers with loans where the increase was expected shortly. As discussed, these loans, such as 2-28 ARMs, will tend to attract consumers who have a short planning horizon and intend to avoid the payment increase by refinancing. If provided only a brief penalty-free window to refinance before the increase (as proposed, a window in months 23 and 24 for a 2-28 ARM), the consumer deciding whether to accept a loan with a penalty provision--assuming the consumer was provided a genuine choice--must predict quite precisely when he will want to refinance. If the consumer believes he will want to refinance in month 18 and that his credit score, home equity, and other indicators of credit quality will be high enough then to enable him to refinance, then the consumer probably would be better off with a loan without a penalty provision. If, however, the consumer believes he will not be ready or able to refinance until month 23 or 24 (the penalty-free win-dow), he probably would be better off accepting the penalty provision. It is not reasonable to expect consumers in the subprime market to make such precise predictions. Moreover, for transactions on which prepayment penalties are per-mitted by the final rule, a sixty-day window would be moot because the penalty provision may not exceed two years and the payment on a loan with a penalty provision may not change during the first four years following consummation. n91

73 FR 44522, *

n91 The Board sought comment on whether it should revise § 226.20(c) or draft new disclosure requirements to reconcile that section with the proposed requirement that a prepayment penalty provision expire at least sixty days prior to the date of the first possible payment increase. This issue is also moot.

*Refinance loan from same creditor.* The Board is adopting with minor revisions the proposed requirement that a prepayment penalty not apply when a creditor refinances a higher-priced mortgage loan the creditor or its affiliate originated. HOEPA imposes this requirement in connection with HOEPA loans. 15 U.S.C. 1639(c)(2)(B).

Some large financial institutions and financial institution trade associations that commented opposed the proposal. A large bank stated that the requirement would not prevent loan flipping and that mortgage brokers would easily circumvent the rule by directing repeat customers to a different creditor each time. A mortgage bankers' trade association and a large bank stated that the requirement would prevent customers from returning to the same institution with which they have existing relationships. Another large bank stated that the rule would place lenders at a competitive disadvantage when trying to refinance the loan of an existing customer.

Requiring that a prepayment penalty not apply when a creditor refinances a loan it originated will discourage originators from seeking to "flip" a higher-priced mortgage loan. To prevent evasion by creditors who might direct borrowers to refinance with an affiliated creditor, the same-lender refinance rule covers loans by a creditor's affiliate. Although creditors may waive a prepayment penalty when they refinance a loan that they originated to a consumer, consumers who refinance with the same creditor may be charged a prepayment penalty even if a creditor or mortgage broker has told the consumer that the prepayment penalty would be waived in that circumstance. n92

n92 This concern is evident, for example, in a settlement agreement that ACC Capital Holdings Corporation and several of its subsidiaries, including Ameriquest Mortgage Company (collectively, the Ameriquest Parties) made in 2006 with 49 states and the District of Columbia. The Ameriquest Parties agreed not to make false, misleading, or deceptive representations regarding prepayment penalties and specifically agreed not to represent that they will waive a prepayment penalty at some future date, unless that promise is made in writing and included in the terms of a loan agreement with a borrower. *See, e.g., Iowa ex rel. Miller* v. *Ameriquest Mortgage Co.*, No. 05771 EQCE-053090 at 18 (Iowa D. Ct. 2006) (Pls. Pet. 5).

The final rule requires that a prepayment penalty not apply where a creditor or its affiliate refinances a higher-priced mortgage loan that the creditor originated to the consumer. The final rule is based on TILA Section 129(c)(2)(B), 15 U.S.C. 1639(c)(2)(B), which provides that a HOEPA loan may contain a prepayment penalty "if the penalty applies only to a prepayment made with amounts obtained by the consumer by means other than a refinancing by the creditor under the mortgage, or an affiliate of that creditor." The Board notes that TILA Section 129(c)(2)(B), 15 U.S.C. 1639(c)(2)(B), applies regardless of whether the creditor still holds the loan at the time of a refinancing by the creditor or an affiliate of the creditor. In some cases, a creditor's assignees are the "true creditor" funding the loan; moreover, the rule prevents loan transfers designed to evade the prohibition.

TILA Section 129(c)(2)(B) does not prohibit a creditor from refinancing a loan it or its affiliate originated but rather requires that a prepayment penalty not apply in the event of a refinancing by the creditor or its affiliate. To make clear that the associated regulation, § 226.32(d)(7)(ii), does not prohibit a creditor from refinancing a loan that the creditor (or an affiliate of the creditor) originated, the Board is revising the text of that regulation somewhat. Final § 226.32(d)(7)(ii) states that a HOEPA loan may provide for a prepayment penalty if the prepayment penalty provision will not apply if the source of the prepayment funds is a refinancing by the creditor or an affiliate of the creditor. This change clarifies, without altering, the meaning of the provision and is technical, not substantive, in nature. Final § 226.35(b)(2)(ii)(B) applies to higher-priced mortgage loans rather than to HOEPA loans but mirrors final § 226.32(d)(7)(ii) in all other respects.

*Debt-to-income ratio.* Under the proposed rule, a higher-priced mortgage loan could not include a prepayment penalty provision if, at consummation, the consumer's DTI ratio exceeds 50 percent. Proposed comments would have given examples of funds and obligations that creditors commonly classify as "debt" and "income" and stated that creditors may, but need not, look to widely accepted governmental and non-governmental underwriting standards to determine how to classify particular funds or obligations as "debt" or "income."

Most banking and financial services trade associations and several large banks stated that the Board should not prohibit prepayment penalties on higher-cost loans where a consumer's DTI ratio at consummation exceeds 50 percent. Several of these commenters stated that the proposed rule would disadvantage a consumer living on a fixed income but with significant assets, including many senior citizens. Some of these commenters stated that the proposed rule would

disadvantage consumers in areas where housing prices are relatively high. Some consumer organizations also objected to the proposed DTI-ratio requirement, stating that the requirement would not protect low-income borrowers with a DTI ratio equal to or less than 50 percent but limited residual income.

The Board is not adopting a specific DTI ratio in the rule prohibiting disregard of repayment ability. *See* part IX.B. For the same reasons, the Board is not adopting the proposed prohibition of a prepayment penalty for all higher-priced mortgage loans where a consumer's DTI ratio at consummation exceeds 50 percent. The Board is, however, leaving the prohibition in  [*44557]  place as it applies to HOEPA loans, as this prohibition is statutory, TILA Section 129(c)(2)(A)(ii), and its removal does not appear warranted at this time.

This statute provides that for purposes of determining whether at consummation of a HOEPA loan a consumer's DTI ratio exceeds 50 percent, the consumer's income and expenses are to be verified by a financial statement signed by the consumer, by a credit report, and, in the case of employment income, by payment records or by verification from the employer of the consumer (which verification may be in the form of a pay stub or other payment record supplied by the consumer). The Board proposed to adopt a stronger standard that would require creditors to verify the consumer's income and expenses in accordance with verification rules that the Board proposed and is adopting in final § 226.34(a)(4)(ii), together with associated commentary. Although the Board requested comment about the proposal to revise § 226.32(d)(7)(iii) and associated commentary, commenters did not discuss this proposal.

As proposed, the Board is strengthening the standards that § 226.32(d)(7)(iii) establishes for verifying the consumer's income and expenses when determining whether a prepayment penalty is prohibited because the consumer's DTI ratio at consummation of a HOEPA loan exceeds 50 percent. There are three bases for adopting an income verification requirement that is stronger than the standard TILA Section 129(c)(2)(A)(ii) establishes. First, under TILA Section 129(l)(2), the Board has a broad authority to update HOEPA's protections as needed to prevent unfair practices. 15 U.S.C. 1639(l)(2)(A). For the reasons discussed in part IX.B, the Board believes that relying solely on the income statement on the application is unfair to the consumer, regardless of whether the consumer is employed by another person, self-employed, or unemployed. Second, the Board has a broad authority under TILA Section 129(l)(2) to update HOEPA's protections as needed to prevent their evasion. 15 U.S.C. 1639(l)(2)(A). A signed financial statement declaring all or most of a consumer's income to be self-employment income or income from sources other than employment could be used to evade the statute. Third, establishing a single standard for verifying a consumer's income and obligations for HOEPA loans and higher-priced mortgage loans will facilitate compliance.

For the foregoing reasons, for HOEPA loans, final § 226.32(d)(7)(iii) requires creditors to verify that the consumer's total monthly debt payments do not exceed 50 percent of the consumer's monthly gross income using the standards set forth in final § 226.34(a)(4)(ii). The Board also is revising the commentary associated with § 226.32(d)(7)(iii) to cross-reference certain commentary associated with § 226.34(a)(4).

*Disclosure.* For reasons discussed above, the Board does not believe that disclosure alone is sufficient to enable consumers to avoid injury from a prepayment penalty. There is reason to believe, however, that disclosures could more effectively increase transparency. n93 The Board will be conducting consumer testing to determine how to make disclosures more effective. As part of this process, the Board will consider the recommendation from some commenters that creditors who provide loans with prepayment penalties be required to disclose the terms of a loan without a prepayment penalty.

n93 For example, an FTC study based on quantitative consumer testing using several fixed-rate loan scenarios found that improving a disclosure of the prepayment penalty provision increased the percentage of participants who could tell that they would pay a prepayment penalty if they refinanced. *Improving Mortgage Disclosures* 109.

*D. Escrows for Taxes and Insurance-- § 226.35(b)(3)*

The Board proposed in § 226.35(b)(3) to require a creditor to establish an escrow account for property taxes and homeowners insurance on a higher-priced mortgage loan secured by a first lien on a principal dwelling. Under the proposal, a creditor may allow a consumer to cancel the escrow account, but no sooner than 12 months after consummation. The Board is adopting the rule as proposed and adding limited exemptions for loans on cooperative shares and, in certain cases, condominium units.

The final rule requires escrows for all covered loans secured by site-built homes for which creditors receive applications on or after April 1, 2010, and for all covered loans secured by manufactured housing for which creditors receive applications on or after October 1, 2010.

73 FR 44522, *

## Public Comments

Many community banks and mortgage brokers as well as several industry trade associations opposed the proposed escrow requirement. Many of these commenters contended that mandating escrows is not necessary to protect consumers. They argued that consumers are adequately protected by the proposed requirement to consider a consumer's ability to pay tax and insurance obligations under § 226.35(b)(1), and by a disclosure of estimated taxes and insurance they recommended the Board adopt. Commenters also contended that setting up an escrow infrastructure would be very expensive; creditors will either pass on these costs to consumers or decline to originate higher-priced mortgage loans.

Individual consumers who commented also expressed concern about the proposal. Some consumers expressed a preference for paying their taxes and insurance themselves out of fear that servicers may fail to pay these obligations fully and on-time. Many requested that, if escrows are required, creditors be required to pay interest on the escrowed funds.

Several industry trade associations, several large creditors and some mortgage brokers, however, supported the proposed escrow requirement. They were joined by the consumer groups, community development groups, and state and federal officials that commented on the issue. Many of these commenters argued that failure to escrow leaves consumers unable to afford the full cost of homeownership and would face expensive force-placed insurance or default, and possibly foreclosure. Commenters supporting the proposal differed on whether and under what circumstances creditors should be permitted to cancel escrows.

Large creditors without escrow systems asked for 12 to 24 months to comply if the proposal is adopted.

## Discussion

As commenters confirmed, it is common for creditors to offer escrows in the prime market, but not in the subprime market. The Board believes that this discrepancy is not entirely the result of consumers in the subprime market making different choices than consumers in the prime market. Rather, subprime consumers, whether they would wish to escrow or not, face a market where competitive forces have prevented significant numbers of creditors from offering escrows at all. In such a market, consumers suffer significant injury, especially, but not only, those who are not experienced handling property taxes and insurance on their own and are therefore least able to avoid these injuries. The Board finds that these injuries outweigh the costs to consumers of offering them escrows. For these reasons, the Board finds that it is unfair for a creditor to make a higher-priced mortgage loan without presenting  [*44558]  the consumer a genuine opportunity to escrow. In order to ensure that the opportunity to escrow is genuine, the final rule requires that creditors establish escrow accounts for first-lien higher-priced mortgage loans for at least twelve months. The Board believes that consumers, creditors, and investors will all benefit from this requirement.

*Lack of escrow opportunities in the subprime market.* Relative to the prime market, few creditors in the subprime market offer consumers the opportunity to escrow. The Board believes that, absent a rule requiring escrows, market forces alone are unlikely to drive significant numbers of creditors to begin to offer escrows in the subprime market. Consumers in the subprime market tend to shop based on monthly payment amounts, rather than on interest rates. n94 So creditors who are active in the subprime market, and who can quote low monthly payments to a prospective borrower, have a competitive advantage over creditors that quote higher monthly payments. A creditor who does not offer the opportunity to escrow (and thus quotes monthly payments that do not include amounts for escrows) can quote a lower monthly payment than a creditor who does offer an opportunity to escrow (and thus quotes a higher monthly payment that includes amounts for escrow). Consequently, creditors in the subprime market who offer escrows may be at a competitive disadvantage to creditors who do not.

n94 *Subprime Mortgage Investigation* at 554 ("Our focus groups suggested that prime and subprime borrowers use quite different search criteria in looking for a loan. Subprime borrowers search primarily for loan approval and low monthly payments, while prime borrowers focus on getting the lowest available interest rate. These distinctions are quantitatively confirmed by our survey.").

Creditors who offer escrows could try to overcome this competitive disadvantage by advertising the availability and benefits of escrows to subprime consumers. Yet offering escrows entails some significant cost to the creditor. The creditor must either outsource servicing rights to third party servicers and lose servicing revenue, or make a large initial investment to establish an escrow infrastructure in-house. According to comments from some creditors, the cost to set up an escrow infrastructure could range between one million dollars and $ 16 million for a large creditor. While escrows

improve loan performance n95 and offer creditors assurance that the collateral securing the loan is protected, those advantages alone have not proven sufficient incentive to make escrowing widespread in the subprime market. Rather, if a creditor is to recoup its costs for offering an opportunity to escrow, the creditor must convince a significant number of subprime consumers that they would be better served by accepting a higher monthly payment with escrows rather than a lower monthly payment without escrows. Yet consumers' focus on the lowest monthly payments in the subprime market, and the lack of familiarity with escrows, could make it difficult to convince consumers to accept the higher payment. In addition, the creditor who offered escrows would be vulnerable to competitors' attempts to lure away existing borrowers by quoting a lower monthly payment without disclosing that the payment does not include amounts for escrows. Nor could a creditor who offered escrows necessarily count on consumers who wanted to escrow finding the creditor on their own. If only a small minority of creditors offer escrows, consumers would, on average, have to contact many creditors in order to find one that offers escrows and many consumers might reasonably give up the search before they were successful.

n95 An industry representative at the Board's 2007 hearing indicated that her company's internal analysis showed that escrows clearly improved loan performance. *Home Ownership and Equity Protection Act (HOEPA): Public Hearing*, at 66 (June 14, 2007) (statement of Faith Schwartz, Senior Vice President, Option One Mortgage Corp.), available at *http://federalreserve.gov/events/publichearings/hoepa/2007/20070614/transcript.pdf*. Also, the Credit Union National Association and California and Nevada Credit Union Leagues comment letters note that "[o]verall, loans with escrow accounts are likely to perform better than loans without these accounts."

Under these conditions, creditors are unlikely to offer escrows unless their competitors are required to offer escrows. The Board believes that creditors' failure to establish a capacity to escrow is a collective action problem; creditors would likely be better off if escrows were widely available in the subprime market, but most creditors who have not offered escrows lack the necessary incentive to invest in the requisite systems unless their competitors do. This is the context for the Board's finding that it is unfair for a creditor to make a higher-priced mortgage loan without offering an escrow.

*Substantial injury*. A creditor's failure to offer escrows can cause consumers substantial injury. The lack of escrows in the subprime market increases the risk that consumers will base borrowing decisions on unrealistically low assessments of their mortgage-related obligations. Brokers and loan officers operating in a market where escrows are not common generally quote monthly payments of only principal and interest. These originators have little incentive to disclose or emphasize additional obligations for taxes and insurance. Therefore, many consumers will decide whether they can afford the offered loan on the basis of misleadingly low payment quotes, making it more likely that they will obtain mortgages they cannot afford. This risk is particularly high for first time homebuyers, who lack experience with the obligations of homeownership. The risk is also elevated for homeowners who currently have prime loans and contribute to an escrow. If their circumstances change and they refinance in the subprime market, they may not be aware that payments quoted to them do not include amounts for escrow. For example, current homeowners who have substantial unsecured consumer debt, but who also have equity in their homes, can be especially vulnerable to "loan flipping" because they may find a cash-out refinance offer attractive. Yet if they assumed, erroneously, that the monthly payment quoted to them included amounts for escrows, they would not be able to evaluate the true cost of the loan product being offered.

The lack of escrows in the subprime market also makes it more likely that certain consumers will not be able to handle their mortgage obligations including taxes and insurance. Subprime consumers, by definition, are those who have experienced some difficulty in making timely payments on debt obligations. For this reason, some consumers may prefer to escrow if offered a choice, especially if they know from personal experience that they have difficulty saving on their own, paying their bills on-time, or both. Without an escrow, these consumers may be at greater risk that a servicer will impose costly force-placed homeowners insurance or the local government will seek to foreclose to collect unpaid taxes. Consumers with unpaid property tax or insurance bills are particularly vulnerable to predatory lending practices: originators offering them a refinancing with "cash out" to cover their tax and insurance obligations can take advantage of their urgent circumstances. The consumers who cannot or will not borrow more (for example, because they lack the equity) face default and a forced sale or foreclosure.

*Injury not reasonably avoidable*. Consumers cannot reasonably avoid the injuries that result from the lack of escrows. As described above, originators in the subprime market have strong incentives to quote only principal and interest payment amounts, and much   [*44559]   weaker incentives to inform consumers about tax and insurance obligations since doing so could put them at a competitive disadvantage. Consumers may either be left unaware of the magnitude of their taxes and insurance obligations, or may not realize that amounts for taxes and insurance are not being es-

crowed for them if they are accustomed to the prime market's practice of escrowing. And, in a market where few creditors offer escrows and advertise their availability, consumers who would prefer to escrow may give up trying to find a creditor who offers escrows. Given the market they face, subprime consumers have little ability or incentive to shop for a loan with escrows, and thus cannot reasonably avoid a loan that does not offer escrows.

*Injury not outweighed by countervailing benefit to consumers or to competition.* The Board recognizes that creditors incur costs in initiating escrow capabilities and that creditors who do not escrow can pass their cost savings on to consumers. Creditors that offer escrows in-house may incur potentially substantial costs in setting up or acquiring the necessary systems, although they may also gain some additional servicing revenue. Creditors that outsource servicing of escrow accounts to third parties incur some cost and forgo servicing revenue.

In addition, there are some potential costs to consumers. Servicers may at times collect more funds than needed or fail to pay property taxes and insurance when due, causing consumers to incur penalties and late fees. Congress has expressly authorized the Department of Housing and Urban Development (HUD) to address these problems through section 10 of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2609, which limits amounts that may be collected for escrow accounts; requires servicers to provide borrowers annual statements of the escrow balance and payments for property taxes and homeowners insurance; and requires a mortgage servicer to provide information about anticipated activity in the escrow accounts for the coming year when it starts to service a loan. RESPA also provides consumers the means to resolve complaints by filing a "qualified written request" with the servicer. The Board expects that the number of qualified written requests may increase after the final rule takes effect.

On the other hand, there is evidence, described above, that where escrows are used they improve loan performance to the advantage of creditors, investors, and consumers alike. This appears to be an important reason that escrows are common in the prime market and often required by the creditor. Loans with escrows generally perform better than loans without because escrows make it more likely that consumers will be able to pay their obligations. By contrast, when consumers are faced with unpaid taxes and insurance, they may need to tap into their home equity to pay these expenses and may become vulnerable to predatory lending. In the worst cases, consumers may lose their homes to foreclosure for failure to pay property taxes. For these reasons, the Board finds that the benefits from escrows outweigh the costs associated with requiring them.

The Final Rule

The final rule prohibits a creditor from extending a first-lien higher-priced mortgage loan secured by a principal dwelling without escrowing property taxes, homeowners insurance, and other insurance obligations required by the creditor. Creditors have the option to allow for cancellation of escrows at the consumer's request, but no earlier than 12 months after consummation of the loan transaction. The Board is adopting an exemption for loans secured by cooperative shares and a partial exemption for loans secured by condominium units. The final rule defines "escrow account" by reference to the definition of "escrow account" in RESPA. Moreover, RESPA's rules for administering escrow accounts (including how creditors handle disclosures, initial escrow deposits, cushions, and advances to cover shortages) apply. The final rule also complements the National Flood Insurance Program requirement that flood insurance premiums be escrowed if the creditor requires escrow for other obligations such as hazard insurance. n96

n96 Congress authorized NFIP through the National Flood Insurance Act of 1968 (42 U.S.C. 4001), which provides property owners with an opportunity to purchase flood insurance protection made available by the federal government for buildings and their contents. NFIP requires all federally regulated private creditors and government-sponsored enterprises (GSEs) that purchase loans in the secondary market to ensure that a building or manufactured home and any applicable personal property securing a loan in a special flood hazard area are covered by adequate flood insurance for the term of the loan. The flood insurance requirements do not apply to creditors or servicers that are not federally regulated and that do not sell loans to Fannie Mae and Freddie Mac or other GSEs.

The rule is intended to address the consumer injuries described above caused by the lack of a genuine opportunity to escrow in the subprime market. The rule assures a genuine opportunity to escrow by establishing a market that provides widespread escrows through a requirement that every creditor that originates higher-priced mortgage loans secured by a first lien on a principal dwelling establish an escrow with each loan. The Board proposed to limit the rule to first-lien higher-priced mortgage loans because creditors in the prime market have traditionally required escrow accounts on first-lien mortgage loans as a means of protecting the lender's interest in the property securing the loan. The final rule adopts this approach. A mandatory escrow account on a first-lien loan ensures that funds are set aside for payment of property taxes and insurance premiums and eliminates the need to require an escrow on second lien loans.

73 FR 44522, *

One commenter asked the Board to clarify in the final rule that creditors are not obligated to escrow payments for optional items that the consumer may choose to purchase at its discretion, such as an optional debt-protection insurance or earthquake insurance. A commentary provision has been added to clarify that creditors and servicers are not required to escrow optional insurance items chosen by the consumer and not otherwise required by creditor. *See* comment to § 226.35(b)(4)(i).

The Board recognizes that escrows can impose certain financial costs on both creditors and borrowers. Creditors are likely to pass on to consumers, either in part or entirely, the cost of setting up and maintaining escrow systems, whether done in-house or outsourced. The Board also recognizes that prohibiting consumers from canceling before 12 months have passed will impose costs on individual consumers who prefer to pay property taxes and insurance premiums on their own, and to earn interest on funds that otherwise would be escrowed. n97 By paying property taxes and insurance premiums directly, consumers are better able to monitor that their payments are credited on time, thus limiting the likelihood, and related cost, of servicing mistakes and abuses. In addition, homebuyers do not need as much cash at closing when they are not required to have an escrow account.

n97 Some states require creditors to pay interest to consumers for escrowed funds but most states do not have such a requirement.

The Board believes, however, that the benefits of the rule outweigh these costs. Moreover, the rule preserves some degree of consumer choice by permitting a creditor to provide the consumer an option to cancel an escrow account 12 or more months after consummation. The Board considered alternatives that would avoid requiring a creditor to set up an escrow system,  [*44560]  or that would require a creditor to offer an escrow, but permit consumers to opt-out of escrows at closing. These alternatives would not provide consumers sufficient protection from the injuries discussed above, as explained in more detail below.

*Alternatives to requiring creditors to escrow.* Some creditors that currently do not escrow oppose requiring escrows because of the substantial cost to set up new systems and maintain them over time. They suggested that narrower, less costly alternatives would protect consumers adequately. Most of these suggestions involved disclosure, such as: requiring creditors to warn consumers that they will be responsible for property tax and insurance obligations; estimating these obligations on the TILA disclosure based on recent assessments; and prohibiting creditors from advertising monthly payments without including estimated amounts for property taxes and insurance.

The Board does not believe that these disclosures would adequately protect consumers from the injuries discussed above. Because many consumers focus on monthly payment obligations, competition would continue to give originators incentives to downplay tax and insurance obligations when they discuss payment obligations with consumers. A disclosure provided at origination of the estimated property tax and insurance premiums does not assist those consumers who need an escrow to ensure they save for and pay their obligations on time. Moreover, adding a disclosure to the many disclosures consumers already receive would not be sufficient to educate first time homebuyers and homeowners whose previous loans contained escrows who lack any real experience handling their own taxes and insurance. Disclosure does, however, have an important role to play. Under the final rule, an advertisement for closed-end credit secured by a first lien on a principal dwelling that states a monthly payment of principal and interest must prominently disclose that taxes and insurance premiums are not included. *See* § 226.24(f)(3). Moreover, the Board plans to explore revising the TILA disclosures to add an estimate of property tax and insurance premium costs to the disclosed monthly payment.

For similar reasons, merely mandating that creditors offer escrows, but not that they require them, would not sufficiently address the injuries associated with the failure to escrow. Without a widespread requirement to escrow, some creditors could still press a competitive advantage in quoting low monthly payments that do not include amounts for escrows by encouraging consumers to decline the offered escrow. A rule that required creditors merely to offer escrows would impose essentially the same costs on creditors to establish escrow systems as would the requirement to establish escrows, but would not alter the competitive landscape of the subprime market in a way that would make widespread escrowing more likely.

Creditors also suggested that consumers would be adequately protected by the final rule's requirement that creditors consider a consumer's ability to handle tax and insurance obligations in addition to principal and interest payments when originating loans. *See* § 226.34(a)(4). While this requirement will help ensure that consumers can afford their monthly payment obligations, it will not adequately address the injuries discussed above because creditors would continue to have incentives to downplay tax and insurance obligations when they discussed payment obligations with consumers. Nor will the rule requiring consideration of repayment ability sufficiently assist consumers in saving on their own.

73 FR 44522, *

Another alternative would be to require escrows only for first time homebuyers or other classes of borrowers (such as previously prime borrowers) less likely to have experience handling tax and insurance obligations on their own. However, limiting the escrow requirement to borrowers who are unaccustomed to paying taxes and insurance on their own would only delay injury, rather than prevent it. For example, if first time homebuyers with higher-priced mortgage loans were required to escrow, those consumers would not gain the experience of paying property taxes and insurance on their own and might reasonably believe that escrows are standard. When those consumers went to refinance their loan, however, creditors could mislead them by quoting payments without amounts for escrow and the consumers might not be able to handle the tax and insurance obligations on their own.

In addition, requiring escrows only for first time homebuyers or other classes of borrowers would not save a creditor the substantial expense of setting up an escrow system unless the creditor declined to extend higher-priced mortgage loans to such borrowers. The Board believes most creditors would not find this option practical over the long term. Moreover, defining the categories of covered borrowers would present practical challenges, require regular adjustment as the market changed, and complicate creditors' compliance.

Several commenters recommended that the requirement to escrow be limited to higher-priced mortgage loans with a combined loan-to-value ratio that exceeds 80 percent. They contended that borrowers with at least 20 percent equity have the option to tap this equity to finance tax and insurance obligations. The suggested exemption could, however, have the unintended consequence of permitting unscrupulous originators to "strip" the equity from less experienced borrowers. As described above, homeowners with existing escrow accounts who want to refinance their loans may assume erroneously that payment quotes include escrows when they do not, or they may prefer the security that an escrow would provide if offered.

*Cancellation after consummation.* The final rule permits, but does not require, creditors to offer consumers an option to cancel their escrows 12 months after consummation of the loan transaction. Based on the operation of escrows in the prime market, the Board anticipates that creditors will likely offer cancellation in exchange for a fee. The Board acknowledges concerns expressed by individual consumers that requiring them to escrow for even a relatively short time will increase their costs. These costs include the opportunity costs of the funds in escrow, particularly if the funds do not earn interest; a fee to cancel after 12 months; costs associated with mistakes or abuses by escrow agents; and the cost of saving for the deposit at consummation of two months or more of escrow payments that RESPA permits a creditor to require. Mindful of these costs, the Board considered requiring only that creditors offer consumers a choice to escrow either on an "opt in" or "opt out" basis.

As explained above, the Board concluded that a requirement merely to offer the consumer a choice to escrow would not be effective to prevent the injuries associated with the lack of opportunity to escrow. A requirement to offer, not require, escrows would raise creditors' costs but would not eliminate their incentive to quote lower payment amounts without escrows and encourage borrowers to opt-out. Requiring creditors to disclose information about the benefits of escrowing would not adequately address this problem. It is likely that most consumers would reasonably focus their attention more on disclosures about the terms of the credit being offered, such as the monthly payment amount, rather than on information   [*44561]   about the benefits of escrowing. An originator engaged in loan flipping might reassure the consumer that if the consumer has any difficulty with the tax and insurance obligations the originator will refinance the loan.

For the foregoing reasons, the Board does not believe that requiring creditors merely to offer escrows with higher-priced mortgage loans, with an opt out or opt in before consummation, would provide consumers sufficient protection. The Board has concluded that requiring creditors to impose escrows on borrowers with higher-priced mortgage loans, with an option to cancel only some time after consummation, would more effectively address the problems created by subprime creditors' failure to offer escrows. This approach imposes costs on creditors that will be passed on, at least in part, to consumers but the Board believes these costs are outweighed by the benefits. Moreover, to the extent that escrows improve loan performance and lead to fewer defaults, the benefits of escrows may reduce the costs associated with establishing and maintaining escrow accounts.

*Twelve months mandatory escrow.* The final rule sets the mandatory period for escrows at 12 months after loan origination, at which point creditors may allow borrowers to opt out of escrow. Some community groups commented that escrows should be mandatory for a longer period or even the life of the loan. Several groups commented that borrowers should not be allowed to opt out unless they have demonstrated a record of timely payments. Several commenters noted that consumers should be allowed to opt out at loan consummation.

73 FR 44522, *

The Board believes that a 12 month period appropriately balances consumer protection with consumer choice. For the reasons already explained, a mandatory period of some length is necessary to ensure that originators will not urge consumers to reduce their monthly payment by choosing not to escrow immediately at, or shortly after, loan consummation. Twelve months appears to be a sufficiently long period to render such efforts ineffectual, and to introduce consumers to the benefits of escrowing, as most consumers will receive bills for taxes and insurance in that period. Moreover, 12 months is a relatively short period compared to the expected life of the average loan, providing consumers an opportunity to handle their own taxes and insurance obligations after the initial escrow requirement expires.

Although fees to cancel escrow accounts are common, a consumer who expects to hold the loan for a long period may find it worthwhile to pay the fee. The final rule neither permits nor prohibits creditors from imposing escrow cancellation fees and instead defers to state law on that issue. Similarly, the rule neither requires nor prohibits payment of interest on escrow accounts since some, but not all, states have chosen to address consumer concerns about losing the opportunity to invest their funds by requiring creditors to pay interest on funds in escrow accounts.

Exemptions for Cooperatives; Partial Exemption for Condominiums

In response to comments and the Board's own analysis, the final rule does not require escrows for property taxes and insurance premiums for first-lien higher-priced mortgage loans secured by shares in a cooperative if the cooperative association pays property tax and insurance premiums. The final rule requires escrows for property taxes for first-lien higher-priced mortgage loans secured by condominium units but exempts from the escrow requirement insurance premiums if the condominium's association maintains and pays for insurance through a master policy.

*Cooperatives.* The final rule exempts mortgage loans for cooperatives from the escrow requirement if the cooperative pays property tax and insurance premiums, and passes the costs on to individual unit owners based on their pro rata ownership share in the cooperative. A cooperative association typically owns the building, land, and improvements, and each unit owner holds a cooperative share loan based on the appraisal value of the shareholder's unit. Creditors typically require cooperative associations to maintain insurance coverage under a single package policy, commonly called an association master policy, for common elements, including fixtures, service equipment and common personal property. Creditors periodically review an association master policy to ensure adequate coverage.

At loan origination, creditors inform consumers of their monthly cooperative association dues, which include, among other costs, the consumer's pro rata share for insurance and property taxes. When property taxes and insurance premiums are included in the monthly association dues, they are generally not escrowed with the lender. This is because the consumer's payment of the monthly association dues acts in a manner similar to an escrow itself. In this way, the collection of insurance premiums and property tax amounts on a monthly basis by a cooperative association ensures that taxes and insurance are paid when due.

*Condominiums.* The final rule exempts certain higher-priced mortgage loans secured by condominium units from the requirement to escrow for homeowners insurance where the only insurance policy required by the creditor is the condominium association master policy. No exemption is provided, however, for escrows for property taxes.

Typically, individual condominium units are taxed similarly to single-family homes. Generally, each unit owner pays the property tax for the unit and each unit is assessed its pro rata share of property taxes for common areas. Condominium owners who do not have escrow accounts receive property tax bills directly from the taxing jurisdiction. The final rule requires escrows for property taxes for all higher-priced mortgage loans secured by condominium units, regardless of whether creditors are required to escrow insurance premiums for such loans.

Homeowners insurance for condominiums, on the other hand, can vary based on the condominium association's bylaws and other governing regulations, as well as specific creditor requirements. Generally, the condominium association insures the building and the common area under an association master policy. In some cases, the condominium association does not insure individual units and a separate insurance policy must be written for each individual unit, just as it would be for a single-family home. In other cases, the master policy does cover individual unit owners' fixtures and improvements other than personal property. When the condominium association insures the entire structure, including individual units, the condominium association pays the insurance premium and passes the costs on to the individual unit owner. Much like the cooperative arrangement described above, the consumer's payment of insurance premiums through condominium association dues acts in a manner similar to an escrow account. For this reason, the final rule does not require creditors to escrow insurance premiums for higher-priced mortgage loans secured by condominium units if the only insurance that the creditor requires is an association master policy that insures condominium units.

73 FR 44522, *

Manufactured Housing

The final rule requires escrows for all covered loans secured by manufactured housing for which creditors receive applications on or after October 1, 2010   [*44562]   to allow creditors and servicers sufficient time to establish the capacity to escrow. Manufactured housing industry commenters requested that manufactured housing loans be exempted from the escrow requirement. They argued that manufactured housing loans are mostly personal property loans taxed in many local jurisdictions like other personal property, and that creditors and servicers do not require and do not offer escrows on manufactured housing loans. n98 For reasons discussed in more detail below, the final rule does not exempt from the escrow requirement higher-priced mortgage loans secured by a first lien on manufactured housing used as the consumer's principal dwelling. The final rule applies to manufactured housing whether or not state law treats it as personal or real property. n99

n98 Manufactured housing creditors are currently required by law to escrow for property taxes in Texas. Prior to passing state legislation requiring escrows on manufactured housing, Texas legislators observed that many manufactured housing owners were unaware of, and unable to pay, their property tax. *See* Tex. SB 521, 78th Tex. Leg., 2003, effective June 18, 2003; bill analysis available through the Texas Senate Research Center at *http://www.legis.state.tx.us/tlodocs/78R/analysis/pdf/SB00521I.pdf.*

n99 Regulation Z currently defines a dwelling to include manufactured housing. *See* § 226.2(a)(19). Official staff commentary § 226.2(a)(19) states that mobile homes, boats and trailers are dwellings if they are in fact used as residences; § 226.2(b) clarifies that the definition of "dwelling" includes any residential structure, whether or not it is real property under state law; §§ 226.15(a)(1)-5 and 226.23(a)(1)-3 make clear that a dwelling may include structures that are considered personal property under state laws (*e.g.*, mobile home, trailer or houseboat) and draws no distinction between personal property loans and real property loans.

A manufactured home owner typically pays personal property taxes directly to the taxing authority and insurance premiums directly to the insurer. Manufactured housing industry commenters argued that if a taxing jurisdiction does not have an automated personal property tax system, creditors and servicers would have to service escrows on manufactured housing loans manually at prohibitively high cost, especially taking into consideration small loan size and low amount of property taxes for an average manufactured home.

The Board believes, nonetheless, that problems associated with first-lien higher-priced mortgage loans secured by manufactured housing are similar to problems associated with site-built home loans discussed above. Large segments of manufactured housing consumers are low to moderate income families who may not enter the market with full information about the obligations associated with owning manufactured housing. Instead, consumers are likely to rely on the dealer or the manufacturer as their source for information, which can leave consumers vulnerable. Often, consumers obtain financing through the dealer, who ties the financing to the sale of the home. In addition, commissions and yield spread premiums may be paid to dealers for placing consumers in high cost loans. n100

n100 Kevin Jewell, *Market Failures Evident in Manufactured Housing* (Jan. 2003), *http://www.consumersunion.org/consumeronline/pastissues/housing/marketfailure.html.*

In addition, manufactured homes are usually concentrated in developments, such as parks, where they represent a large percentage of homes. Where property tax revenues are the main source of funding for local government services, a failure by a significant number of homeowners to pay property taxes could cause a reduction in local government services and an attendant decline in property values.

The Board believes that homeowners of manufactured housing should be afforded the same consumer protections as the owners of site-built homes. Manufactured homes provide much needed affordable housing for millions of Americans who, like owners of site-built homes, risk losing their homes for failure to pay property taxes. Escrows for property taxes and insurance premiums on first-lien, higher-priced mortgage loans secured by manufactured homes that are consumers' principal dwellings are necessary to prevent creditors from understating the cost of homeownership, to inform consumers that their manufactured home is subject to property tax, and to extend an opportunity to consumers to escrow funds each month for payment of property tax and insurance premiums.

State Laws

Several industry commenters asked the Board to clarify in the final rule that the escrow requirement preempts inconsistent state escrow laws. TILA generally preempts only inconsistent state laws. *See* TILA Section 111(a)(1), 15 U.S.C. 1610, § 226.28. Several consumers expressed concern that the regulation would preempt state laws requiring

creditors to pay interest on escrow accounts under certain conditions. The final rule does not prevent states from requiring creditors to pay interest on escrowed amounts. *See* comment § 226.35(b)(4)(i).

Effective Date

Several industry representatives commented that the escrow requirement would require major system and infrastructure changes by creditors that do not currently have escrow capabilities. They asked for an extended compliance deadline of 12 to 24 months prior to the effective date of the final rule to allow for necessary escrow systems and procedures to develop. The Board recognizes that creditors and servicers will need some time to develop in-house escrowing capabilities or to outsource escrow servicing to third parties. For that reason, the Board agrees that an extended compliance period is appropriate for most covered loans secured by site-built homes. Therefore, the final rule is effective for first-lien higher-priced mortgage loans for which creditors receive applications on or after April 1, 2010, except for loans secured by manufactured housing. Recognizing that there is a limited infrastructure for escrowing on manufactured housing loans, and that yet additional time is needed for creditors and servicers to comply with the rule, the final rule is effective for all covered loans secured by manufactured housing for which creditors receive applications on or after October 1, 2010.

*E. Evasion Through Spurious Open-End Credit-- § 226.35(b)(4)*

The exclusion of HELOCs from § 226.35 is discussed in subpart A. above. As noted, the Board recognizes that the exclusion of HELOCs could lead some creditors to attempt to evade the restrictions of § 226.35 by structuring credit as open-end instead of closed-end. Section 226.34(b) addresses this risk as to HOEPA loans by prohibiting creditors from structuring a transaction that does not meet the definition of "open-end credit" as a HELOC to evade HOEPA. The Board proposed to extend this rule to higher-priced mortgage loans and is adopting § 226.35(b)(5). Section 226.35(b)(5) prohibits a creditor from structuring a closed-end transaction--that is, a transaction that does not meet the definition of "open-end credit"--as a HELOC to evade the restrictions of § 226.35. The Board is also adding comment 35(b)(5)-1 to provide guidance on how to apply the higher-priced mortgage loan APR trigger in § 226.35(a) to a transaction structured as open-end credit in violation of § 226.35. Comment 35(b)(5)-1 is substantially similar to comment 34(b)-1 which applies to HOEPA loans.

Public Comment

The Board received relatively few comments on the proposed anti-evasion rule. As discussed in subpart A. above, some commenters suggested applying § 226.35 to HELOCs, which would  [*44563]  eliminate the need for an anti-evasion provision. By contrast, some creditors who supported the exclusion of HELOCs from § 226.35 noted that the presence of the anti-evasion provision would address concerns about HELOCs being used to evade the rules in § 226.35. However, a few creditors expressed concern that the anti-evasion proposal was too vague. One commenter stated that loans that do not meet the definition of open-end credit would be subject to the closed-end rules with or without the anti-evasion provision, and this commenter stated that therefore the anti-evasion provision was unnecessary and might cause confusion.

The Board also requested comment on whether it should limit an anti-evasion rule to HELOCs secured by first-liens, where the consumer draws down all or most of the entire line of credit immediately after the account is opened. Commenters did not express support for this alternative, and a few explicitly opposed it.

The Final Rule

The Board is adopting the anti-evasion provision as proposed. The rule is not meant to add new substantive requirements for open-end credit, but rather to ensure that creditors do not structure a loan which does not meet the definition of open-end credit as a HELOC to evade the requirements of § 226.35. The Board recognizes that consumers may prefer HELOCs to closed-end home equity loans because of the added flexibility HELOCs provide them. The Board does not intend to limit consumers' ability to choose between these two ways of structuring home equity credit. The anti-evasion provision is intended to reach cases where creditors have structured loans as open-end "revolving" credit, even if the features and terms or other circumstances demonstrate that the creditor had no reasonable expectation of repeat transactions under a reusable line of credit. Although the practice violates TILA, the new rule will subject creditors to HOEPA's stricter remedies if the credit carries an APR that exceeds § 226.35's APR trigger for higher-priced mortgage loans.

The Board is also adding comment 35(b)(5)-1 to provide guidance on how to apply the higher-priced mortgage loan APR trigger in § 226.35(a) to a transaction structured as open-end credit in violation of § 226.35. Specifically, the comment provides guidance on how to determine the "amount financed" and the "principal loan amount" needed to determine the loan's APR. The comment provides that the amount of credit that would have been extended if the loan had been documented as a closed-end loan is a factual determination to be made in each case.

## X. Final Rules for Mortgage Loans-- § 226.36

Section 226.35, discussed above, applies certain new protections to higher-priced mortgage loans and HOEPA loans. In contrast, § 226.36 applies other new protections to mortgage loans generally, though only if secured by the consumer's principal dwelling. The final rule prohibits: (1) Creditors or mortgage brokers from coercing, influencing, or otherwise encouraging an appraiser to provide a misstated appraisal and (2) servicers from engaging in unfair fee and billing practices. The final rule neither adopts the proposal to require servicers to deliver a fee schedule to consumers upon request, nor the proposal to prohibit creditors from paying a mortgage broker more than the consumer had agreed in advance that the broker would receive. As with proposed § 226.35, § 226.36 does not apply to HELOCs.

The Board finds that the prohibitions in the final rule are necessary to prevent practices that the Board finds to be unfair, deceptive, associated with abusive lending practices, or otherwise not in the interest of the borrower. *See* TILA Section 129(l)(2), 15 U.S.C. 1639(l)(2), and the discussion of this statute in part V.A above. The Board also believes that the final rules will enhance consumers' informed use of credit. *See* TILA Sections 105(a), 102(a).

### A. Creditor Payments to Mortgage Brokers-- § 226.36(a)

The Board proposed to prohibit a creditor from paying a mortgage broker in connection with a covered transaction more than the consumer agreed in writing, in advance, that the broker would receive. The broker would also disclose that the consumer ultimately would bear the cost of the entire compensation even if the creditor paid any part of it directly; and that a creditor's payment to a broker could influence the broker to offer the consumer loan terms or products that would not be in the consumer's interest or the most favorable the consumer could obtain. n101 Proposed commentary provided model language for the agreement and disclosures. The Board stated that it would test this language with consumers before determining how it would proceed on the proposal.

n101 Creditors could demonstrate compliance with the proposed rule by obtaining a copy of the broker-consumer agreement and ensuring their payment to the broker does not exceed the amount stated in the agreement. The proposal would provide creditors two alternative means to comply, one where the creditor complies with a state law that provides consumers equivalent protection, and one where a creditor can demonstrate that its payments to a mortgage broker are not determined by reference to the transaction's interest rate.

The Board tested the proposal with several dozen one-on-one interviews with a diverse group of consumers. On the basis of this testing and other information, the Board is withdrawing the proposal. The Board will continue to explore available options to address unfair acts or practices associated with originator compensation arrangements such as yield spread premiums. The Board is particularly concerned with arrangements that cause the incentives of originators to conflict with those of consumers, where the incentives are not transparent to consumers who rely on the originators for advice. As the Board comprehensively reviews Regulation Z, it will continue to consider whether disclosure or other approaches could be effective to address this problem.

Public Comment

The Board received over 4700 comments on the proposal. Mortgage brokers, their federal and state trade associations, the Federal Trade Commission, and several consumer groups argued that applying the proposed disclosures to mortgage brokers but not to creditors' employees who originate mortgages ("loan officers") would reduce competition in the market and harm consumers. They contended that disclosing a broker's compensation would cause consumers to believe, erroneously, that a loan arranged by a broker would cost more than a loan originated by a loan officer. These commenters stated that many brokers would unfairly be forced out of business, and consumers would pay higher prices, receive poorer service, or have fewer options. The FTC, citing its published report of consumer testing of mortgage broker compensation disclosures, contended that focusing consumers' attention on the amount of the broker's compensation could confuse consumers and, under some circumstances, lead them to select a more expensive loan.

Mortgage brokers and some creditors expressed concerns that the proposed rule would not be practicable in cases where creditors forward applications to other creditors and where brokers decide to fund an application using a warehouse line of credit.

Consumer advocates, members of Congress, the FDIC, and others stated   [*44564]   that the proposal would not address the conflict of interest between consumers and brokers that rate-based compensation of brokers (the yield spread premium) can cause. These commenters urged that the only effective remedy for the conflict is to ban this form of compensation. State regulators expressed concern that the proposed disclosures would not provide consumers sufficient information, and could give brokers a legal "shield" against claims they acted contrary to consumers' interests.

Creditors and their trade associations, on the other hand, generally supported the proposal, although with a number of suggested modifications. These commenters agreed with the Board that yield spread premiums create financial incentives for brokers to steer consumers to less beneficial products and terms. They saw a need for regulation to remove or limit these incentives.

Commenters generally did not believe the proposed alternatives for compliance (where a state law provides substantially equivalent protections or where a creditor can show that the compensation amount is not tied to the interest rate) were feasible. Creditors and mortgage brokers stated that both alternatives were vague and would be little used. Consumer advocates believed the alternatives would likely create loopholes in the rule.

Comments on specific issues are discussed in more detail below as appropriate.

Discussion

The proposal was intended to limit the potential for unfairness, deception, and abuse in yield spread premiums while preserving the ability of consumers to cover their payments to brokers through rate increases. Creditor payments to brokers based on the interest rate give brokers an incentive to provide consumers loans with higher interest rates. Many consumers are not aware of this incentive and may rely on the broker as a trusted advisor to help them navigate the complexities of the mortgage application process.

The proposal sought to reduce the incentive of the broker to increase a consumer's rate and increase the consumer's leverage to negotiate with the broker. Under the proposal, creditor payments to brokers would be conditioned on a broker's advance commitment to a specified compensation amount. The proposal would require the agreement to be entered into before an application was submitted by a consumer or prior to the payment of any fee, whichever occurred earlier. Requiring an agreement before a fee or application would help ensure the compensation was set as independently as possible of loan's rate and other terms, and that the consumer would not feel obligated to proceed with the transaction. The Board also anticipated that the proposal would increase transparency and improve competition in the market for brokerage services, which could lower the price of these services, improve the quality of those services, or both.

*Reasons for withdrawal.* Based on the Board's analysis of the comments, consumer testing, and other information, the Board is withdrawing the proposal. The Board is concerned that the proposed agreement and disclosures would confuse consumers and undermine their decision-making rather than improve it. The risks of consumer confusion arise from two sources. First, an institution can act as either creditor or broker depending on the transaction; as explained below, this could render the proposed disclosures inaccurate and misleading in some, possibly many, cases of both broker and creditor originations. Second, consumers who participated in one-on-one interviews about the proposed agreement and disclosures often concluded, erroneously, that brokers are categorically more expensive than creditors or that brokers would serve their best interests notwithstanding the conflict resulting from the relationship between interest rates and brokers' compensation.

*Dual roles.* Mortgage brokers and creditors noted that creditors and brokers often play one of two roles. That is, an institution that is ordinarily a creditor and originates loans in its name may determine that it cannot approve an application based on its own underwriting criteria and present it to another creditor for consideration. This practice is known as "brokering out." The institution brokering out an application would be a mortgage broker under the proposed rule; to receive compensation from the creditor, it would have to execute the required agreement and provide the required disclosures.

The proposal requires a broker to enter an agreement and give disclosures before the consumer submits an application, but an institution often may not know whether it will be a broker or a creditor for that consumer until it receives and evaluates the application. An institution that is ordinarily a creditor but sometimes a broker would have to enter into the agreement and give the disclosures for all consumers that seek to apply. In many cases, however, the institution will

originate the loan as a creditor and not switch to being a broker. In these cases, the agreement and disclosures, which describe the institution as a broker and state its compensation as if it were brokering the transaction, would likely mislead and confuse the consumer. This problem also arises, if less frequently, when an institution that ordinarily brokers instead acts as creditor on occasion. On those occasions, the disclosures also would likely be misleading and confusing.

The source of the problem is the proposed requirement that the agreement be signed and disclosures given before the consumer has applied for a loan or paid a fee. The Board considered permitting post-application execution and disclosure by institutions that perform dual roles. The proposed timing, however, was intended to ensure that a consumer would be apprised of the broker's compensation and understand the broker's role before becoming, or feeling, committed to working with the broker. Accordingly, the Board concluded that providing this information later in the loan transaction would seriously undermine the proposal's objective of empowering the consumer to shop and negotiate.

*Consumer testing.* Consumer testing also suggested that at least some aspects of the proposal could confuse and mislead consumers. After publishing the proposal, a Board contractor, Macro International, Inc. ("Macro"), conducted in-depth one-on-one interviews with a diverse group of several dozen consumers who recently had obtained a mortgage loan. n102 Macro developed and tested a form in which the broker would agree to a specified total compensation and disclose (i) that any part of the compensation paid by the creditor would cost the consumer a higher interest rate, and (ii) that creditor payments to brokers based on the rate create a conflict of interest between mortgage brokers and consumers. Throughout the testing, revisions were made to the form in an effort to improve comprehension. The testing revealed two difficulties with the forms tested.

n102 For more details on the consumer testing, see Macro's report, *Consumer Testing of Mortgage Broker Disclosures,* (July 10, 2008), available at *http://www.federalreserve.gov.*

First, the form's statements that the consumer would pay the broker through a higher rate and that the broker had a conflict of interest confused many participants. Many participants stated, upon reading the disclosure, that if they agreed to pay the compensation the broker was asking, then the broker   [*44565]   would be obliged to find them the lowest interest rate and best terms available. Many participants reached this conclusion despite the clear statement in the form tested that brokers can increase their compensation by increasing the interest rate.

Second, many first-round participants stated or implied after reading the form that working through a broker would cost them more than working directly with a lender, which is not necessarily true. A new provision was added to the disclosure stating that lenders' employees are paid the same types of rate-based commissions as brokers and have the same conflict of interest. Many participants, however, continued to voice a belief that brokered loans must cost more than direct loans.

The results of testing indicate that consumers did not sufficiently understand some major aspects of the proposed disclosures. On the one hand, the disclosures could cause consumers to believe that mortgage brokers have obligations to them that the law does not actually impose. In consumer testing, this belief seemingly resulted from the disclosure of the fact that the consumer would pay the broker a commission, and it persisted notwithstanding the accompanying disclosure of the conflict of interest resulting from the rate-commission relationship. On the other hand, the disclosures could cause consumers to believe that retail loans are categorically less costly than brokered loans. Notwithstanding an explicit statement in the tested forms that commissions based on interest rates also are paid to loan officers, many participants voiced the belief that loan officers' commissions would be lower than brokers' commissions. They offered different reasons for this conclusion, including for example that the lender and not the consumer would pay the loan officer's commission.

Despite the difficulties with the disclosures observed in consumer testing, there were also some successes. For instance, consumers generally appeared to understand the language describing the potential conflict of interest, as noted above, even though it often was ignored because of seemingly conflicting information. In addition, language intended to convey to consumers the importance of shopping on their own behalf in the mortgage market appeared to be successful. These more encouraging results suggest that further development of a disclosure approach to creditor payments to mortgage originators, through additional consumer testing, still may have merit.

*Conclusion.* The Board considered whether it could resolve the problems described above by applying the proposal to the retail channel. The Board concluded, however, that substantial additional testing and analysis would be required to determine whether such an approach would be effective. Therefore, the Board is withdrawing the proposal. The Board will continue to explore available options to address potential unfairness associated with originator compensation arrangements such as yield spread premiums. As the Board comprehensively reviews Regulation Z, it will continue to

consider whether disclosures or other approaches could effectively remedy this potential unfairness without imposing unintended consequences.

Definition of Mortgage Broker

In connection with the proposal relating to mortgage broker compensation and the proposal prohibiting coercion of appraisers, the Board proposed to define "mortgage broker" as a person, other than a creditor's employee, who for monetary gain arranges, negotiates, or otherwise obtains an extension of credit for a consumer. A person who met this definition would be considered a mortgage broker even if the credit obligation was initially payable to the person, unless the person funded the transaction from its own resources, from deposits, or from a bona fide warehouse line of credit. Commenters generally did not comment on the proposed definition.

Defining "mortgage broker" is still necessary, notwithstanding the Board's withdrawal of the proposed regulation of creditor payments to mortgage brokers, as mortgage brokers are subject to the prohibitions on coercion of appraisers, discussed below. The Board is adopting the definition of mortgage broker with a minor change to clarify that the term "mortgage broker" does not include a person who arranges, negotiates, or otherwise obtains an extension of credit for him or herself.

*B. Coercion of Appraisers-- § 226.36(b)*

The Board proposed to prohibit creditors and mortgage brokers and their affiliates from coercing, influencing, or otherwise encouraging appraisers to misstate or misrepresent the value of a consumer's principal dwelling. The Board also proposed to prohibit a creditor from extending credit when it knows or has reason to know, at or before loan consummation, that an appraiser has been encouraged by the creditor, a mortgage broker, or an affiliate of either, to misstate or misrepresent the value of a consumer's principal dwelling, unless the creditor acts with reasonable diligence to determine that the appraisal was accurate or extends credit based on a separate appraisal untainted by coercion. The Board is adopting the rule substantially as proposed. The Board has revised some of the proposed examples of conduct that violates the rule and conduct that does not violate the rule and has added commentary about when a misstatement of a dwelling's value is material.

Public Comment

Consumer and community advocacy groups, appraiser trade associations, state appraisal boards, individual appraisers, some financial institutions and banking trade associations, and a few other commenters expressed general support for the proposed rule to prohibit appraiser coercion. Several of these commenters stated that the rule would enhance enforcement against parties that are not subject to the same oversight as depository institutions, such as independent mortgage companies and mortgage brokers. Some of the commenters who supported the rule also suggested including additional practices in the list of examples of prohibited conduct. In addition, several appraiser trade associations jointly recommended that the Board prohibit appraisal management companies from coercing appraisers.

On the other hand, community banks, consumer banking and mortgage banking trade associations, and some large financial institutions opposed the proposed rule, stating that its adoption would lead to nuisance suits by borrowers who regret the amount they paid for a house and would make creditors liable for the actions of mortgage brokers and appraisers. Several of these commenters stated that the Board's rule would duplicate requirements set by existing laws and guidance, including federal regulations, interagency guidelines, state laws, and the Uniform Standards of Professional Appraisal Practice (USPAP). Further, some of these commenters stated that creditors have limited ability to detect undue influence and should be held liable only if they extend credit knowing that a violation of § 226.36(b)(1) had occurred.

Many commenters discussed appraisal-related agreements that Fannie Mae and Freddie Mac have entered into with the Attorney General of New York and the Office of Federal Housing Enterprise Oversight (GSE Appraisal Agreements), which incorporated a   [*44566]   Home Valuation Code of Conduct. These commenters urged the Board to coordinate with the parties to the GSE Appraisal Agreements to promote consistency in the standards that apply to the residential appraisal process.

The comments are discussed in greater detail below.

Discussion

The Board finds that it is an unfair practice for creditors or mortgage brokers to coerce, influence, or otherwise encourage an appraiser to misstate the value of a consumer's principal dwelling. Accordingly, the Board is adopting the rule substantially as proposed.

*Substantial injury.* Encouraging an appraiser to overstate or understate the value of a consumer's dwelling causes consumers substantial injury. An inflated appraisal may cause consumers to purchase a home they otherwise would not have purchased or to pay more for a home than they otherwise would have paid. An inflated appraisal also may lead consumers to believe that they have more home equity than in fact they do, and to borrow or make other financial decisions based on this incorrect information. For example, a consumer who purchases a home based on an inflated appraisal may overestimate his or her ability to refinance and therefore may take on a riskier loan. A consumer also may take out more cash with a refinance or home equity loan than he or she would have had an appraisal not been inflated. Appraiser coercion thus distorts, rather than enhances, competition. Though perhaps less common than overstated appraisals, understated appraisals can cause consumers to be denied access to credit for which they qualified.

Inflated or understated appraisals of homes concentrated in a neighborhood may affect appraisals of neighboring homes, because appraisers factor into a property valuation the value of comparable properties. For the same reason, understated appraisals may affect appraisals of neighboring properties. Therefore, inflating or deflating appraised value can harm consumers other than those who are party to the transaction with the misstated appraisal.

*Injury not reasonably avoidable.* Consumers who are party to a consumer credit transaction cannot prevent creditors or mortgage brokers from influencing appraisers to misstate or misrepresent a dwelling's value. Creditors and mortgage brokers directly or indirectly select and contract with the appraisers that value a dwelling for a consumer credit transaction. Consumers will not necessarily be aware that a creditor or mortgage broker is pressuring an appraiser to misstate or misrepresent the value of the principal dwelling they offer as collateral for a loan. Furthermore, consumers who own property near a dwelling securing a consumer credit transaction but are not parties to the transaction are not in a position to know that a creditor or mortgage broker is coercing an appraiser to misstate a dwelling's value. Consumers thus cannot reasonably avoid injuries that result from creditors' or mortgage brokers' coercing, influencing, or encouraging an appraiser to misstate or misrepresent the value of a consumer's principal dwelling.

*Injury not outweighed by benefits to consumers or to competition.* The Board finds that the practice of coercing, influencing, or otherwise encouraging appraisers to misstate or misrepresent value does not benefit consumers or competition. Acts or practices that promote the misrepresentation of the market value of a dwelling distort the market, and any competitive advantage a creditor or mortgage broker obtains through influencing an appraiser to misstate a dwelling's value, or that a creditor gains by knowingly originating loans based on a misstated appraisal, is an unfair advantage.

For the foregoing reasons, the Board finds that it is an unfair practice for a creditor or mortgage broker to coerce, influence, or otherwise encourage an appraiser to misstate the value of a consumer's principal dwelling. As discussed in part V.A above, the Board has broad authority under TILA Section 129(l)(2) to adopt regulations that prohibit, in connection with mortgage loans, acts or practices that the Board finds to be unfair or deceptive. 15 U.S.C. 1639(l)(2). Therefore, the Board may adopt regulations prohibiting unfair or deceptive practices by mortgage brokers who are not creditors and unfair or deceptive practices that are ancillary to the origination process, when such practices are "in connection with mortgage loans." Because appraisals play an important role in a creditor's decision to extend mortgage credit as well as the terms of such credit, the Board believes that it fits well within the Board's authority under Section 129(l)(2) to prohibit creditors and mortgage brokers from coercing, influencing, or otherwise encouraging an appraiser to misstate the value of a consumer's principal dwelling and creditors from extending credit based on an appraisal when they know that prohibited conduct has occurred. Therefore, the Board issues the final rule prohibiting such acts under TILA Section 129(l)(2), 15 U.S.C. 1639(l)(2).

The Final Rule

The Board requested comment on the potential costs and benefits of its proposed appraiser coercion regulation. Some securitization trade associations and financial institutions stated that creditors obtain appraisals for their own benefit, to determine whether to extend credit and the terms of credit extended. The Board recognizes that, because appraisals provide evidence of the collateral's sufficiency to avoid losses if a borrower defaults on a loan, creditors have a disincentive to coerce appraisers to misstate value. However, loan originators may believe that they stand to benefit from coercing an appraiser to misstate value, for example, if their compensation depends more on volume of loans originated than on loan performance. Despite the disincentives cited by some commenters, there is evidence that coercion of appraisers is not uncommon, and may even be widespread. n103

n103 For example, the October Research Corporation's 2007 National Appraisal Survey (released in Dec. 2006) found that appraisers reported being pressured to restate, adjust, or change reported property values by mortgage brokers (71 percent), real estate agents (56 percent), consumers (35 percent), lenders (33 percent), and appraisal management companies (25 percent).

A few large banks and a financial services trade association suggested that the Board prohibit mortgage brokers from ordering appraisals, as the GSE Appraisal Agreements do. The Board declines to determine that any particular procedure for ordering an appraisal necessarily promotes false reporting of value. As discussed above, the Board finds that coercion of appraisers by creditors or by mortgage brokers is an unfair practice. Therefore, the final rule prohibits actions by creditors and mortgage brokers that are aimed at pressuring appraisers to misstate the value of a consumer's principal dwelling.

In addition, some commenters stated that the Board's rule would be redundant given the existence of USPAP. USPAP, however, establishes uniform rules regarding preparation of appraisals and addresses the conduct of appraisers, not the conduct of creditors or mortgage brokers. The federal financial institution regulatory agencies have issued to the institutions they supervise regulations and guidance that set forth standards for the policies and procedures institutions should implement to enable appraisers to exercise independent judgment when   [*44567]   valuing a property. n104 For example, these regulations prohibit staff and fee appraisers from having any direct or indirect interest, financial or otherwise, in a subject property; fee appraisers also may not have any such interest in the subject transaction. n105 Unlike the Board's rule, however, these federal regulations do not apply to all institutions. Moreover, these federal rules are part of an overarching framework of regulation and supervision of federally insured depository institutions and are not necessarily appropriate for application to independent mortgage companies and mortgage brokers.

n104 *See, e.g.*, 12 CFR part 208 subpart E and app. C, and 12 CFR part 225 subpart G (Board); 12 CFR part 34, subparts C and D (Office of the Comptroller of the Currency (OCC)); 12 CFR part 323 and 12 CFR part 365 (FDIC); 12 CFR part 564, 12 CFR 560.100, and 12 CFR 560.101 (Office of Thrift Supervision (OTS)); and 12 CFR 722.5 (National Credit Union Administration (NCUA)). Applicable federal guidance the Board, OCC, FDIC, OTS, and NCUA have issued includes Independent Appraisal and Evaluation Functions, dated October 28, 2003, and Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

n105 12 CFR 225.65 (Board); 12 CFR 34.45 (OCC); 12 CFR 323.5 (FDIC); 12 CFR 564.5 (OTS); and 12 CFR 722.5 (NCUA).

Some state legislatures have prohibited coercion of appraisers or enacted general laws against mortgage fraud that may be used to combat appraiser coercion. n106 Not every state, however, has passed laws equivalent to the final rule. Prohibiting creditors and mortgage brokers from pressuring appraisers to misstate or misrepresent the value of a consumer's principal dwelling provides enforcement agencies in every state with a specific legal basis for an action alleging appraiser coercion. Though states are able to take enforcement action against certain institutions that are believed to engage in appraisal abuses, n107 some state laws are preempted as to other creditors. The final rule, adopted under HOEPA, applies equally to all creditors.

n106 *See, e.g.*, Colo. Rev. Stat. § 6-1-717; Iowa Code § 543D.18A; Ohio Rev. Code Ann. §§ 1322.07(G), 1345.031(B), 4763.12(E).

n107 For example, in 2006, 49 states and the District of Columbia (collectively, the Settling States) entered into a settlement agreement with ACC Capital Holdings Corporation and several of its subsidiaries, including Ameriquest Mortgage Company (collectively, the Ameriquest Parties). The Settling States alleged that the Ameriquest Parties had engaged in deceptive or misleading acts that resulted in the Ameriquest Parties' obtaining inflated appraisals of homes' value. *See, e.g., Iowa ex rel Miller* v. *Ameriquest Mortgage Co.*, No. 05771 EQCE-053090 (Iowa D. Ct. 2006) (Pls. Pet. 5). To settle the complaints, the Ameriquest Parties agreed to abide by policies designed to ensure appraiser independence and accurate valuations.

In response to the Board's request for comment about the proposed rule's provisions, commenters addressed three main topics: (1) The terms used to describe prohibited conduct; (2) the specific examples of conduct that is prohibited and conduct that is not prohibited; and (3) the proscription on extending credit where a creditor knows about prohibited conduct.

*Prohibited conduct.* Some commenters recommended that the Board replace the phrase "coerce, influence, or otherwise encourage" with "coerce, bribe, or extort." These commenters stated that the words "influence" and "encourage" are vague and subjective, whereas the words "bribe" and "extort" would provide bright-line standards for compliance.

Like the proposed rule, the final rule prohibits a creditor or mortgage broker from coercing, influencing, or otherwise encouraging an appraiser to misstate the value of a dwelling. The final rule does not limit prohibited conduct to bribery or extortion. Creditors and mortgage brokers may act in ways that would not constitute bribery or extortion but that nevertheless improperly influence an appraiser's valuation of a dwelling. These actions can visit the same harm on consumers as do bribery or extortion, and thus they are prohibited by the final rule. The Board believes that commenters' concerns about the clarity of the terms used in the final rule can be addressed through the examples of conduct that is prohibited and conduct that is not prohibited discussed below.

*Examples of conduct prohibited and conduct not prohibited.* The proposal offered several examples of conduct that would violate the rule and conduct that would not violate the rule. The Board is adopting the proposed examples of prohibited conduct and adding two new examples of prohibited conduct. The Board also is adopting all but one of the proposed examples of conduct that is not prohibited.

Some commenters requested that additional actions be listed as examples that violate the rule, such as:

. Excluding an appraiser from a list of "approved" appraisers because the appraiser had valued properties at an amount that had jeopardized or prevented the consummation of loan transactions.

. Telling an appraiser a minimum acceptable appraised value.

. Providing an appraiser with the price stated in a contract of sale.

. Suggesting that an appraiser consider additional properties as comparable to the subject property, after an appraiser has submitted an appraisal report.

Final § 226.36(b)(1) prohibits conduct that coerces, influences, or encourages an appraiser to misstate or misrepresent the value of a consumer's principal dwelling, and the list of examples the section provides is illustrative and not exhaustive. The Board believes that it is not necessary or possible to list all conceivable ways in which creditors or mortgage brokers could pressure appraisers to misstate a principal dwelling's value. However, the Board has added two examples to enhance the list in § 226.36(b)(1). The final rule does not limit the ability of a creditor or broker to terminate a relationship with an appraiser for legitimate reasons.

*Examples of prohibited conduct.* The Board is adopting the proposed examples of prohibited conduct and adding two examples. The first added example is a creditor's or broker's exclusion of an appraiser from consideration for future engagement due to the appraiser's failure to report a value that meets or exceeds a minimum threshold. This example is adapted from a statement in the supplementary information to the proposed rule. 73 FR 1701. The second added example is telling an appraiser a minimum reported value of a consumer's principal dwelling that is needed to approve the loan. This example is consistent with the position of the Appraisal Standards Board (ASB), which develops, interprets and amends USPAP, that assignments should not be contingent on the reporting of a predetermined opinion of value. n108

n108 *See, e.g.,* ASB Advisory Opinion No. 19, Unacceptable Assignment Conditions in Real Property Appraisal Assignments.

The Board is not adopting other examples of prohibited conduct suggested by commenters. Some commenters urged the Board to prohibit a creditor or mortgage broker from omitting or removing an appraiser's name from a list of approved appraisers, where the appraiser has not valued a property at the desired amount. The Board believes such conduct is encompassed in the examples provided in § 226.36(b)(1)(i)(B) and (C).

Some commenters also requested that the Board add, as an example of a violation, a creditor's or mortgage broker's provision to an appraiser of the contract of sale for the principal dwelling. The Board is not adopting the example. US-PAP Standard Rule 1-5 requires an appraiser to analyze all agreements of sale for a subject property, and Standard Rule 2-2 requires disclosure of information contained in such agreements or an explanation of why such information is unobtainable or irrelevant.   [*44568]

*Examples of conduct that is not prohibited.* The final rule adopts the proposed examples of prohibited conduct with one change. The Board is not adopting proposed § 226.36(b)(1)(ii)(F), which would have provided that the rule would not be violated when a creditor or mortgage broker terminates a relationship with an appraiser for violations of applicable federal or state law or breaches of ethical or professional standards. Some commenters noted that there are other legitimate reasons for terminating a relationship with an appraiser, and they requested that the Board include these as

examples of conduct that is not prohibited so that the provision would not be read as implicitly prohibiting them. The Board believes that it is not feasible to list all of the legitimate reasons a creditor or broker might terminate a relationship with an appraiser. Accordingly, the Board is not adopting proposed § 226.36(b)(1)(ii)(F).

Some commenters suggested that the Board delete, from the examples of conduct that is not prohibited, asking an appraiser to consider additional information about a consumer's principal dwelling or about comparable properties. Although in some cases a post-report request that an appraiser consider additional information may be a subtle form of pressure to change a reported value, in other cases such a request could reflect a legitimate desire to improve an appraisal report. Furthermore, federal interagency guidance directs institutions to return deficient reports to appraisers for correction and to replace unreliable appraisals or evaluations prior to the final credit decision. n109 Therefore, the Board is not deleting, from the examples of conduct that is not prohibited, asking an appraiser to consider additional information about a consumer's principal dwelling or about comparable properties. However, § 226.36(b) prohibits creditors and mortgage brokers from making such requests in order to coerce, influence, or otherwise encourage an appraiser to misstate or misrepresent the value of a dwelling.

n109 *See* Interagency Appraisal and Evaluation Guidelines, SR 94-55 (FIS) (Oct. 24, 1994) at 9.

*Extension of credit.* As proposed, § 226.36(b)(2) provided that a creditor is prohibited from extending credit if the creditor knows or has reason to know, at or before loan consummation, of a violation of § 226.36(b)(1) (for example, by an employee of the creditor or a mortgage broker), unless the creditor acted with reasonable diligence to determine that the appraisal does not materially misstate the value of the consumer's principal dwelling. The proposed comment to § 226.36(b)(2) stated that a creditor is deemed to have acted with reasonable diligence if the creditor extends credit based on an appraisal other than the one subject to the restriction.

The Board is adopting the text of § 226.36(b)(2) and the associated commentary substantially as proposed. Some financial institutions and financial institution trade associations stated that the phrase "reason to know" is vague and that creditors should be held liable for violations only if they extend credit when they had actual knowledge that a violation of § 226.36(b)(1) exists. The final rule prohibits "a creditor who knows, at or before loan consummation, of a violation of § 226.36(b)(1) in connection with an appraisal" from extending credit based on that appraisal, unless the creditor acts with reasonable diligence to determine that the appraisal does not materially misstate or misrepresent the value of the consumer's principal dwelling. Although final § 226.36(b)(2) does not include the phrase "reason to know" included in the proposed rule, the final rule's knowledge standard is not intended to permit willful disregard of violations of § 226.36(b)(1). The Board also is adopting new commentary regarding how to determine whether a misstatement of value is material.

Many banks asked for guidance on how to determine whether an appraisal "materially" misstates a dwelling's value. In response to these comments, the Board is adopting a new comment to § 226.36(b)(2) that provides that a misrepresentation or misstatement of a dwelling's value is not material if it does not affect the credit decision or the terms on which credit is extended. The Board notes that existing appraisal regulations and guidance may direct creditors to take certain steps in the event the creditor knows about problems with an appraisal. For example, the Interagency Appraisal and Evaluation Guidelines dated Oct. 28, 1994 direct institutions to return deficient reports to appraisers and persons performing evaluations for correction and to replace unreliable appraisals or evaluations prior to making a final credit decision. These guidelines further state that changes to an appraisal's estimate of value are permitted only as a result of a review conducted by an appropriately qualified state-licensed or -certified appraiser in accordance with Standard III of USPAP.

The final rule does not dictate specific due diligence procedures for creditors to follow when they suspect a violation of § 226.36(b)(2), however. In addition, the Board does not intend for § 226.36(b)(2) to create grounds for voiding loan agreements where violations are found. That is, if a creditor knows of a violation of § 226.36(b)(1), and nevertheless extends credit in violation of § 226(b)(2), while the creditor will have violated § 226.36(b)(2), this violation does not necessarily void the consumer's loan agreement with the creditor. Whether the loan agreement is void is a matter determined by State or other applicable law.

*C. Servicing Abuses-- § 226.36(c)*

The Board proposed to prohibit certain practices of servicers of closed-end consumer credit transactions secured by a consumer's principal dwelling. Proposed § 226.36(d) provided that no servicer shall: (1) Fail to credit a consumer's periodic payment as of the date received; (2) impose a late fee or delinquency charge where the late fee or delinquency charge is due only to a consumer's failure to include in a current payment a late fee or delinquency charge imposed on

73 FR 44522, *

earlier payments; (3) fail to provide a current schedule of servicing fees and charges within a reasonable time of request; or (4) fail to provide an accurate payoff statement within a reasonable time of request. The final rule, redesignated as § 226.36(c), adopts the proposals regarding prompt crediting, fee pyramiding, and payoff statements, and modifies and clarifies the accompanying commentary. The Board is not adopting the fee schedule proposal, for the reasons discussed below.

## Public Comment

Consumer advocacy groups, federal and state regulators and officials, consumers, and others strongly supported the Board's proposal to address servicing abuses, although some urged alternative measures to address servicer abuses, including requiring loss mitigation. Industry commenters, on the other hand, were generally opposed to certain aspects of the proposals, particularly the fee schedule. Industry commenters also urged the Board to adopt any such rules under its authority in TILA Section 105(a) to adopt regulations to carry out the purposes of TILA, and not under Section 129(l)(2). Commenters also requested several clarifications.

*Prompt crediting.* Commenters generally favored, or did not oppose, the prompt crediting rule. In particular, consumer advocacy groups, federal and state regulators and officials, and others supported the rule. However, some industry commenters and others   [*44569]   requested clarification on certain implementation details. Commenters also disagreed about whether and how to address partial payments.

*Fee pyramiding.* Commenters generally supported prohibiting late fee pyramiding. Several industry commenters argued, however, that a new rule would be unnecessary because servicers are subject to a prohibition on pyramiding under other regulations.

*Fee schedule.* Most commenters opposed the fee schedule proposal. One consumer advocate group criticized the disclosure's utility where consumers cannot shop for and select servicers. Other consumer advocates urged the Board to adopt alternative measures they argued would be more effective to combat fee abuses. Industry commenters also objected to the proposal as impracticable and unnecessarily burdensome. Most industry commenters strongly opposed disclosure of third party fees, particularly because third party fees can vary greatly and may be indeterminable in advance.

*Payoff statements.* Consumer advocates strongly supported the proposal to require provision of payoff statements within a reasonable time. The proposed commentary stated that it would be reasonable under normal market conditions to provide statements within three business days of receipt of a consumer's request. Community banks stated that three business days would typically be adequate. However, large financial institutions and their trade associations urged the Board to adopt a longer time period in the commentary. These commenters also requested other clarifications. The comments are discussed in more detail throughout this section, as applicable.

## Discussion

As discussed in the preamble to the proposed rule, the Board shares concerns about abusive servicing practices. Consumer advocates raised abusive mortgage servicer practices as part of the Board's 2006 and 2007 hearings as well as in recent congressional hearings. n110 Servicer abuses have also received increasing attention both in academia and the press. n111 In particular, consumer advocates have raised concerns that some servicers may be charging consumers unwarranted or excessive fees (such as late fees and other "service" fees) and may be improperly submitting negative credit reports, in the normal course of mortgage servicing as well as in foreclosures. Some of these abusive fees, they contend, result from servicers' failure to promptly credit consumers' accounts, or when servicers pyramid late fees. In addition to anecdotal evidence of significant consumer complaints about servicing practices, abusive practices have been cited in a variety of court cases. n112 In 2003, the FTC announced a $ 40 million settlement with a large mortgage servicer and its affiliates to address allegations of abusive behavior. n113

n110 *See, e.g.*, Comment letter of the National Consumer Law Center to Docket No. OP-1253 (Aug. 15, 2006) at 11; *Legislative Proposals on Reforming Mortgage Practices, Hearing Before the H. Comm. On Fin. Servs.,* 110th Cong. 74 (2007) (Testimony of John Taylor, National Community Reinvestment Coalition).

n111 *See, e.g.,* Paula Fitzgerald Bone, *Toward a General Model of Consumer Empowerment and Welfare in Financial Markets with an Application to Mortgage Servicers,* 42 Journal of Consumer Affairs 165 (Summer 2008); Katherine M. Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims,* University of Iowa Legal Study Research Paper No. 07-29 (Nov. 2007); Kevin McCoy, *Hitting Home: Homeowners Fight for their Mortgage Rights,* USA Today

73 FR 44522, *

(June 25, 2008), available at *http://www.usatoday.com/money/industries/banking/2008-06-25-mortgage-services-countrywide-lawsuit_N.htm*; Mara Der Hovanesian, *The "Foreclosure Factories" Vise,* BusinessWeek.com (Dec. 25, 2006), available at *http://www.businessweek.com/magazine/content/06_52/b4015147.htm?chan=search.*

n112 *See, e.g., Workman* v. *GMAC Mortg. LLC (In re Workman),* 2007 Bankr. LEXIS 3887 (Bankr. D. S.C. Nov. 21, 2007) (servicer held in civil contempt for, among other things, failure to promptly credit payments made before discharge from bankruptcy and charging of unauthorized late and attorneys fees); *Islam* v. *Option One Mortgage Corp.,* 432 F. Supp. 2d 181 (D. Mass 2006) (servicer allegedly continued to report borrower delinquent even after receiving the full payoff amount for the loan); *In Re Gorshstein,* 285 B.R. 118 (S.D.N.Y. 2002) (servicer sanctioned for falsely certifying that borrowers were delinquent); *Rawlings* v. *Dovenmuehle Mortgage Inc.,* 64 F. Supp. 2d 1156 (M.D. Ala. 1999) (servicer failed for over 7 months to correct account error despite borrowers' twice sending copies of canceled checks evidencing payments, resulting in unwarranted late and other fees); *Ronemus* v. *FTB Mortgage Servs.,* 201 B.R. 458 (1996) (among other abuses, servicer failed to promptly credit payments and instead paid them into a "suspense" account, resulting in unwarranted late fees and unnecessary and improper accrual of interest on the note).

n113 Consent Order, *United States* v. *Fairbanks Capital Corp.,* Civ. No. 03-12219-DPW (D. Mass Nov. 21, 2003, as modified Sept. 4, 2007). *See also Ocwen Federal Bank FSB,* Supervisory Agreement, OTS Docket No. 04592 (Apr. 19, 2004) (settlement resolving mortgage servicing issues).

Consumer advocates have also raised concerns that consumers are sometimes unaware of fees charged, or unable to understand the basis upon which fees are charged. This may occur because servicers often do not disclose precise fees in advance; some consumers are not provided any other notice of fees (such as a monthly statement or other after-the-fact notice); and when consumers are provided a statement or other fee notice, fees may not be itemized or detailed. For example, in a number of bankruptcy cases, servicers have improperly assessed post-petition fees without notifying either the consumer or the court. n114 Similarly, because payoff statements lack transparency (in that they do not provide detailed accounting information) and because consumers are often unaware of the exact amount owed, some servicers may assess inaccurate or false fees on the payoff statement. n115

n114 *See, e.g., Jones* v. *Wells Fargo (In re Jones),* 366 B.R. 584 (E.D. La 2007) ("In this Court's experience, few, if any, lenders make the adjustments necessary to properly account for a reorganized debt repayment plan. As a result, it is common to see late charges, fees, and other expenses assessed to a debtor's loan as a result of post-petition accounting mistakes made by lenders."). *See also Payne* v. *Mortg. Elec. Reg. Sys. (In re Payne),* 2008 Bankr. LEXIS 1340 (Bankr. Kan. May 6, 2008); *Sanchez* v. *Ameriquest (In re Sanchez),* 372 B.R. 289 (S.D. Tx. 2007); *Harris* v. *First Union Mortg. Corp. (In re Harris),* 2002 Bankr. LEXIS 771 (Bankr. D. Ala. 2002); *In Re Tate,* 253 B.R. 653.

n115 *See, e.g., Maxwell* v. *Fairbanks Capital Corp. (In re Maxwell),* 281 B.R. 101, 114 (D. Mass 2002) (servicer "repeatedly fabricated the amount of the Debtor's obligation to it out of thin air").

*Substantial injury.* Consumers subject to the servicer practices described above suffer substantial injury. For example, one state attorney general and several consumer advocates stated that failure to properly credit payments is one of the most common problems consumers have with servicers. Servicers that do not timely credit, or that misapply, payments cause the consumer to incur late fees where none should be assessed. n116 Even where the first late fee is properly assessed, servicers may apply future payments to the late fee first. Doing so results in future payments being deemed late even if they are, in fact, paid in full within the required time period, thus permitting the servicer to charge additional late fees--a practice commonly referred to as "pyramiding" of late fees. These practices can cause the account to appear to be in default, and thus can give rise to charging excessive or unwarranted fees to consumers, who may not even be aware of the default or fees if they do not receive statements. Once consumers are in default, these practices can make it difficult for consumers to catch up on payments. These practices also may improperly trigger negative credit reports, which can cause consumers to be denied other credit or pay more for such credit, and   [*44570]   require consumers to engage in time-consuming credit report correction efforts.

n116 *See, e.g. Holland* v. *GMAC Mortg. Corp.,* 2006 U.S. Dist. LEXIS 25723 (D. Kan. 2006) (servicer's misapplication of borrower's payment to the wrong account resulted in improper late fees and negative credit reports, despite borrower's proof of canceled checks); *In re Payne,* 2008 Bankr. LEXIS at *30 (servicer's failure to properly and timely account for payments and failure to distinguish between pre-petition and post-petition payments caused its accounting system and payment history to improperly show borrowers as delinquent in their payments).

In addition, a servicer's failure to provide accurate payoff statements in a timely fashion can cause substantial injury to consumers. One state attorney general commented that its office often receives complaints about unreasonable delays in the provision of payoff statements. Consumers may want to refinance a loan to obtain a lower interest rate or to avoid default or foreclosure, but may be impeded from doing so due to inaccurate or untimely payoff statements. These consumers thus incur additional costs and may be subject to financial problems or even foreclosure. In addition to the injuries caused by delayed payoff statements, consumers are injured by inaccurate payoff statements. As described above, some servicers assess inaccurate or false fees on the payoff statement without the consumer's knowledge. Even when the consumer requests clarification, a servicer may provide an invalid accounting of fees or charges. n117 Or, a servicer may provide the payoff statement too late in the refinancing process for the consumer to obtain clarification without risking losing his or her new loan commitment. n118

n117 *See, e.g., In re Maxwell,* 281 B.R. 101, 114 (D. Mass 2002).

n118 *See, e.g., In re Jones,* 366 B.R. at 587-588 (consumer in bankruptcy forced to remit improper sums demanded on payoff statement or lose loan commitment from new lender. "Although Debtor questioned the amounts [servicer] alleged were due, he was unable to obtain an accounting from [servicer] explaining its calculations or any other substantiation for the payoff.").

*Injury not reasonably avoidable.* The injuries caused by servicer abuses are not reasonably avoidable because market competition is not adequate to prevent abusive practices, particularly when mortgages are securitized and servicing rights are sold. Historically, under the mortgage loan process, a lender would often act as both originator and collector--that is, it would service its own loans. Although some creditors sold servicing rights, they remained vested in the customer service experience in part due to reputation concerns and in part because payment streams continued to flow directly to them. However, with rise of the "originate to distribute" model discussed in part II.B above, the original creditor has become removed from future direct involvement in a consumer's loan, and thus has less incentive and ability to detect or deter servicing abuses or respond to consumer complaints about servicing abuses. When loans are securitized, servicers contract directly with investors to service the loan, and consumers are not a party to the servicing contract.

Today, separate servicing companies play a key role: they are chiefly responsible for account maintenance, including collecting payments, remitting amounts due to investors, handling interest rate adjustments on variable rate loans, and managing delinquencies and foreclosures. Servicers also act as the primary point of contact for consumers after origination, because in most cases the original creditor has securitized and sold the loan shortly after origination. In exchange for performing these services, servicers generally receive a fixed per-loan or monthly fee, float income, and ancillary fees--including default charges--that consumers must pay.

Investors are principally concerned with maximizing returns on the mortgage loans and are generally indifferent to the fees the servicer charges the consumer so long as the fees do not reduce the investor's return (*e.g.,* by prompting an unwarranted foreclosure). Consumers are not able to choose their servicers. Consumers also are not able to change servicers without refinancing, which is a time-consuming, expensive undertaking. Moreover, if interest rates are rising, refinancing may only be possible if the consumer accepts a loan with a higher interest rate. After refinancing, consumers may find their loans assigned back to the same servicer as before, or to another servicer engaging in the same practices. As a result, servicers do not have to compete in any direct sense for consumers. Thus, there may not be sufficient market pressure on servicers to ensure competitive practices. n119

n119 In one survey, J.D. Power found that consumers whose loans have been sold have customer satisfaction scores 32 points lower than those who have remained with the loan originator. J.D. Power and Associates Reports: USAA Ranks Highest in Customer Satisfaction with Primary Mortgage Servicing. Press Release (July 19, 2006), available at *http://www.jdpower.com/corporate/news/releases/pdf/2006117.pdf.*

*Injury not outweighed by countervailing benefits to consumers or to competition.* The injuries described above also are not outweighed by any countervailing benefits to consumers or competition. Commenters did not cite, and the Board is not aware of, any benefit to consumers from delayed crediting of payments, pyramided fees, or delayed issuance of payoff statements.

For these reasons, the Board finds the acts and practices prohibited under § 226.36(c) for closed-end consumer credit transactions secured by a consumer's principal dwelling to be unfair. As described in part V.A above, TILA Section 129(l)(2) authorizes protections against unfair practices "in connection with mortgage loans" that the Board finds to be unfair or deceptive. 15 U.S.C. 1639(l)(2). Therefore, the Board may take action against unfair or deceptive practices by

non-creditors and against unfair or deceptive practices outside of the origination process, when such practices are "in connection with mortgage loans." The Board believes that unfair or deceptive servicing practices fall squarely within the purview of Section 129(l)(2) because servicing is an integral part of the life of a mortgage loan and as such is "in connection with mortgage loans." Accordingly, the final rule prohibits certain unfair or deceptive servicing practices under Section 129(l)(2), 15 U.S.C. 1639(l)(2).

The Final Rule

Section 226.36(c) prohibits three servicing practices. First, the rule prohibits a servicer from failing to credit a payment to a consumer's account as of the date received. Second, the rule prohibits "pyramiding" of late fees by prohibiting a servicer from imposing a late fee on a consumer for making a payment that constitutes the full amount due and is timely, but for a previously assessed late fee. Third, the rule prohibits a servicer from failing to provide, within a reasonable time after receiving a request, an accurate statement of the amount currently required to pay the obligation in full, often referred to as a payoff statement. Under § 226.36(c)(3), the term "servicer" and "servicing" are given the same meanings as provided in Regulation X, 24 CFR 3500.2. As described in more detail below, the Board is not adopting the proposed rule that would prohibit a servicer from failing to provide to a consumer, within a reasonable time after receiving a request, a schedule of all fees and charges it imposes in connection with mortgage loans it services.

The Board recognizes that servicers will incur additional costs to alter their systems to comply with some aspects of the final rule. For example, in some instances some servicers may incur costs in investing in systems to produce payoff statements within a shorter period of time than their current technology affords. As a result, some servicers will, directly or indirectly, pass those costs on to consumers. The Board believes, however, that these costs to consumers are outweighed by  [*44571]   the consumer benefits provided by the rules as adopted.

Prompt Crediting

The Board proposed §§ 226.36(d)(1)(i) and 226.36(d)(2) to prohibit a servicer from failing to credit payments as of the date received. The proposed prompt crediting rule and accompanying commentary are substantially similar to the existing provisions requiring prompt crediting of payment on open-end transactions in § 226.10. The final rule adopts, as §§ 226.36(c)(1)(i) and 226.36(c)(2), the rule substantially as proposed, but with revisions to the proposed commentary to address the questions of partial payments and payment cut-off times. Commentary has also been added or modified in response to commenters' concerns.

Commenters generally favored, or did not oppose, the prompt crediting rule. In particular, consumer advocacy groups, federal and state regulators and officials, and others supported the rule. One state attorney general and several consumer advocacy groups stated that failure to properly credit payments is one of the most common servicing problems they see consumers face. However, as described in more detail below, some industry commenters and others requested clarification on certain implementation details. Commenters also generally disagreed on whether and how to address partial payments.

*Method and timing of payments.* Section 226.36(c)(1)(i) requires a servicer to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency, or except as provided in § 226.36(c)(2). Many industry commenters, as well as the GSEs requested clarifications on the timing and method of crediting payments, and the final staff commentary has been revised accordingly.

For example, final comment 36(c)(1)(i)-1 makes clear that the rule does not require a servicer to physically enter the payment on the date received, but requires only that it be credited as of the date received. The proposed comment explained that a servicer does not violate the rule if it receives a payment on or before its due date and enters the payment on its books or in its system after the due date if the entry does not result in the imposition of a late charge, additional interest, or similar penalty to the consumer, or in the reporting of negative information to a consumer reporting agency. Because consumers are often afforded a grace period before a late fee accrues, the Board has revised the comment to reference grace periods. The final comment thus states that a servicer that receives a payment on or before the due date (or within any grace period), and does not enter the payment on its books or in its system until after the payment's due date (or expiration of any grace period) does not violate the rule as long as the entry does not result in the imposition of a late charge, additional interest, or similar penalty to the consumer, or in the reporting of negative information to a consumer reporting agency. If a payment is received after the due date and any grace period, §