The Board's IRFA complied with the requirements of the RFA. First, the Board described the impact of the proposed rule on small entities by describing the rule's proposed requirements in detail throughout the supplementary information for the proposed rule. Second, the Board described the projected compliance requirements of the rule in its IRFA, noting the need for small entities to update systems, disclosures and underwriting practices. n128 The RFA does not require the Board to undertake an exhaustive economic analysis of the proposal's impact on small entities in the IRFA. Instead, the IRFA procedure is intended to evoke commentary from small businesses about the effect of the rule on their activities, and to require agencies to consider the effect of a regulation on those entities. *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 868 (D.C. Cir. 2001). The Board described the projected impact of the proposed rule and sought comments from small entities themselves on the effect the proposed rule would have on their activities. The Board also notes that the final rule does not adopt the proposed rule on creditor payments to mortgage brokers, reducing the final rule's impact on small mortgage broker entities.

n128 73 FR 1672, 1720 (Jan. 9, 2008).

Advocacy also commented that the Board failed to provide sufficient information about the number of small mortgage brokers that may be impacted by the rule. Section 3(b)(3) of the RFA requires the IRFA to contain a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply. 5 U.S.C. 603(b)(3) (emphasis added). The Board provided a description of the [*44597] small entities to which the proposed rule would apply and provided an estimate of the number of small depository institutions to which the proposed rule would apply. n129 The Board also provided an estimate of the total number of mortgage broker entities and estimated that most of these were small entities. n130 The Board stated that it was not aware of a reliable source for the total number of small entities likely to be affected by the proposal. n131 Thus, the Board did not find it feasible to estimate their number.

n129 *Id.* at 1719.

n130 *Id.* at 1720. According to the National Association of Mortgage Brokers, in 2004 there were 53,000 mortgage brokerage companies that employed an estimated 418,700 people. The Board believes that most of these companies are small entities. In its comment letter, Advocacy noted that the appropriate SBA size standard for mortgage brokers is $ 6.5 million in average annual receipts and that, of 15,590 mortgage broker firms in the U.S. according to the 2002 Economic Census data, 15,195 would be classified as small using the $ 6.5 million standard.

n131 73 FR 1672, 1719 (Jan. 9, 2008).

Advocacy also suggested that the Board's IRFA did not sufficiently address alternatives to the proposed rule. Section 3(c) of the RFA requires that an IRFA contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. 5 U.S.C. 603(c). The Board's IRFA discusses the alternative of improved disclosures and requests comment on other alternatives. Advocacy commented that the Board's IRFA does not discuss the economic impact that the disclosure alternative would have on small entities. Yet the Board's IRFA discussion of the disclosure alternative indicates that the Board does not believe that the disclosure alternative would accomplish the stated objectives of applicable statutes. n132 Advocacy also suggested that the Board did not discuss other alternatives such as a later implementation date. However, the Board specifically discussed and requested comment on the effective date in another section of the supplementary information to the proposed rule. n133 Section 5(a) of the RFA permits an agency to perform the IRFA analysis (among others) in conjunction with or as part of any other analysis required by any other law if such other analysis satisfies the provisions of the RFA. 5 U.S.C. 605(a). Other alternatives were discussed throughout the supplementary information to the Board's proposal.

n132 *Id.* at 1720.

n133 *Id.* at 1717.

*Other comments.* In addition to Advocacy's comment letter, a number of industry commenters expressed concerns that the rule, as proposed, would be costly to implement, would not provide enough flexibility, and would not adequately respond to the needs or nature of their business. Many commenters argued that improved disclosures could protect consumers against unfair acts or practices in connection with closed-end mortgage loans secured by a consumer's principal dwelling as well as the proposed rule. As discussed in part XII, while the Board anticipates proposing improvements to mortgage loan disclosures, the Board believes that better disclosures alone would not adequately address unfair, abusive or deceptive practices in the mortgage market, including the subprime market. Since improved disclosures alone would fail to accomplish the stated objectives of TILA Section 129(l)(2), which authorizes the Board to

prohibit unfair or deceptive practices in connection with mortgage loans, the Board concluded that improved disclosures alone do not represent a significant alternative to the proposed rule, as a result of which the IRFA did not discuss the economic impact of improved disclosures.

Many of the issues raised by commenters do not apply uniquely to small entities and are addressed above in other parts of the **SUPPLEMENTARY INFORMATION**. The comments that expressed specific concerns about the effect of the proposed rule on small entities are discussed below.

*Defining loans as higher-priced.* The proposed rule defined higher-priced mortgage loans as loans with an APR that exceeds the comparable Treasury security by three or more percentage points for first-lien loans, or five or more percentage points for subordinate-lien loans. Some small banks, community banks and manufactured housing representatives expressed concerns that, based on the proposed definition of higher-priced mortgage loans, some prime loans may be classified as higher-priced, which could have negative impact on their business. Many of these commenters proposed changing the definition of higher-priced mortgage loans, and manufactured housing industry representatives proposed a separate standard for personal property loans on manufactured homes.

As discussed above, the Board is adopting a definition of "higher-priced mortgage loan" that is similar in concept to the definition proposed, but different in the particulars. The final definition, like the proposed definition, sets a threshold above a market rate to distinguish higher-priced mortgage loans from the rest of the mortgage market. Instead of yields on Treasury securities, the definition in the final rule uses a survey-based estimate of market rates for the lowest-risk prime mortgages, referred to as the average prime offer rate. The Board believes that the final rule will more effectively meet both goals of covering prime loans and excluding prime, though it will cover some prime loans under certain market conditions.

*Escrows.* The proposed rule would require creditors to establish escrow accounts for taxes and insurance and permitted them to allow borrowers to opt out of escrows 12 months after loan consummation. Several industry commenters noted that the compliance with the escrow proposal would be costly and many small banks and community banks commented that they do not currently require escrows because of this cost. A few small lenders commented that the costs of setting up escrow accounts are prohibitively expensive but did not disclose what such costs are. Manufactured housing industry commenters were especially concerned about the cost of requiring escrows for manufactured homes that are taxed as personal property because there is no unified, systematic process for the collection of personal property taxes among various government entities.

The final rule is adopted substantially as proposed. As discussed above, the Board does not believe that alternatives to the final rule would achieve HOEPA's objectives. The Board has, however, chosen effective dates for the final rule that give creditors a longer implementation period for establishing escrow accounts. Comments on the effective dates of the final rule are discussed below.

*Broker disclosures.* The Board proposed to prohibit creditors from paying a mortgage broker more than the consumer had agreed in advance that the broker would receive. A large number of mortgage brokers commented that the proposal could lead to brokers being less competitive in the marketplace and may result in some small brokers exiting the marketplace.

The Board tested the proposal in several dozen one-on-one interviews with a diverse group of consumers. On the basis of this testing and other information, the Board is withdrawing its proposal to prohibit creditors from paying a mortgage broker more than the [*44598] consumer had agreed in advance that the broker would receive. The Board is concerned that the proposed agreement and disclosures would confuse consumers and undermine their decision making rather than improve it. The Board will continue to explore available options to address potentially unfair acts or practices associated with originator compensation arrangements such as yield spread premiums.

*Servicing.* The proposed rule prohibited mortgage servicers from "pyramiding" late fees, failing to credit payments as of the date of receipt, failing to provide loan payoff statements upon request within a reasonable time, or failing to deliver a fee schedule to a consumer upon request. Several commenters noted that the fee schedule disclosures would be very costly for a servicer since fees vary by state, county, city, investor and even product. The Board has considered the concerns raised by commenters and has concluded that the transparency benefit of the schedule does not sufficiently offset the burdens of producing such a schedule. Thus, the Board is not adopting the proposed fee schedule disclosure.

*Early disclosures.* The proposed rule would require creditors to give consumers transaction-specific, early mortgage loan disclosures for certain closed-end loans secured by a consumer's principal dwelling. The proposed rule would require creditors to deliver this disclosure within three business days of application and before a consumer pays a fee to

73 FR 44522, *

any person, other than a fee for obtaining the consumer's credit report. Many creditors and their trade associations opposed the proposal due to operational cost and compliance difficulties (for example, system reprogramming, testing, procedural changes, and staff training). They noted that the burden may be significant for some small entity creditors, such as community banks.

The Board is adopting § 226.19(a)(1)(iii) substantially as proposed. The Board believes that alternatives to the final rule would not achieve TILA's objectives. However, as discussed below, the Board has chosen an implementation period for the final rule that responds to creditors' concerns about the time required to comply with the rule.

*Effective date.* The Board requested comment on whether six months would be an appropriate implementation period, and on the length of time necessary for creditors to implement the proposed rules, as well as whether the Board should specify a shorter implementation period for certain provisions in order to prevent unfair or deceptive practices.

Many industry commenters and their trade associations stated that six months would be an appropriate implementation period for some parts of the rule, but that they would need additional time to implement the proposed early mortgage loan disclosure requirement and the proposed escrow requirement. Commenters requested additional time to implement the early mortgage loan disclosure rule in order to provide sufficient time for system re-programming, testing, procedural changes, and staff training. And, although many creditors currently provide for escrows, other creditors, including many that are small entities, currently have no escrowing capacity or infrastructure. These commenters requested a period of 12 to 24 months to implement the necessary systems and processes. Manufactured housing industry commenters were particularly concerned because a limited infrastructure is in place for escrowing on manufactured housing loans.

In light of these concerns, the Board believes additional compliance time beyond six months is appropriate. With two exceptions, the final rule is effective for loans consummated on or after October 1, 2009. The requirement to establish an escrow account for taxes and insurance for higher-priced mortgage loans is effective for loans consummated on or after April 1, 2010, or, for loans secured by manufactured housing, consummated on or after October 1, 2010.

3. *Description and Estimate of Small Entities To Which the Proposed Rule Would Apply*

The final rule applies to all institutions and entities that engage in closed-end home-secured lending and servicing. The Board acknowledged in its IRFA the lack of a reliable source for the total number of small entities likely to be affected by the proposal, since the credit provisions of TILA and Regulation Z have broad applicability to individuals and businesses that originate, extend and service even small numbers of home-secured credit.

Through data from Reports of Condition and Income ("call reports"), the Board identified approximate numbers of small depository institutions that would be subject to the proposed rules. Based on March 2008 call report data, approximately 8,393 small institutions would be subject to the final rule. Approximately 17,101 depository institutions in the United States filed call report data, approximately 12,237 of which had total domestic assets of $ 165 million or less and thus were considered small entities for purposes of the RFA. Of 4,554 banks, 401 thrifts and 7,318 credit unions that filed call report data and were considered small entities, 4,259 banks, 377 thrifts, and 3,757 credit unions, totaling 8,393 institutions, extended mortgage credit. For purposes of this analysis, thrifts include savings banks, savings and loan entities, co-operative banks and industrial banks.

In its IRFA, the Board recognized that it could not identify with certainty the number of small nondepository institutions that would be subject to the proposed rule. Home Mortgage Disclosure Act (HMDA) data indicate that 2,004 non-depository institutions filed HMDA reports in 2006. Based on the small volume of lending activity reported by these institutions, most are likely to be small.

Certain parts of the final rule would apply to mortgage brokers. The Board provided an estimate of the number of mortgage brokers in its IRFA, citing data from the National Association of Mortgage Brokers indicating that in 2004 there were 53,000 mortgage brokerage companies. n134 The Board estimated in the IRFA that most of these companies are small entities. A comment letter received by the U.S. Small Business Administration, citing the 2002 Economic Census, stated that there were 15,195 small mortgage broker entities.

n134 http://www.namb.org/namb/Industry_Facts.asp?SnID=719224934.

Certain parts of the final rule would also apply to mortgage servicers. As noted in IRFA, the Board is not aware, however, of a source of data for the number of small mortgage servicers. The available data are not sufficient for the

Board to realistically estimate the number of mortgage servicers that would be subject to the final rule and that are small as defined by the U.S. Small Business Administration.

*4. Reporting, Recordkeeping, and Other Compliance Requirements*

The compliance requirements of the final rule are described in the **SUPPLEMENTARY INFORMATION**. Some small entities will be required, among other things, to modify their underwriting practices and home-secured credit disclosures to comply with the revised rules. The precise costs to small entities of updating their systems, disclosures, and underwriting practices are difficult to predict. These costs will depend on a number of unknown factors, including, among other things, the specifications of the [*44599] current systems used by such entities to prepare and provide disclosures and/or solicitations and to administer and maintain accounts, the complexity of the terms of credit products that they offer, and the range of such product offerings. For some small entities, certain parts of the rule may require the type of professional skills already necessary to meet other legal requirements. For example, the Board believes that final rule's requirements with regard to advertising will require the same types of professional skills and recordkeeping procedures that are needed to comply with existing TILA and Regulation Z advertising rules. Other parts of the rule may require new professional skills and recordkeeping procedures for some small entities. For example, creditors that do not currently offer escrow accounts will need to implement that capability. The Board believes that costs of the final rule as a whole will have a significant economic effect on small entities.

*5. Steps Taken To Minimize the Economic Impact On Small Entities*

The steps the Board has taken to minimize the economic impact and compliance burden on small entities, including the factual, policy, and legal reasons for selecting the alternatives adopted and why each one of the other significant alternatives was not accepted, are described above in the **SUPPLEMENTARY INFORMATION** and in the summary of issues raised by the public comments in response to the proposal's IRFA. The final rule's modifications from the proposed rule that minimize economic impact on small entities are summarized below.

First, the Board has provided a different standard for defining higher-priced mortgage loans to more accurately correspond to mortgage market conditions and exclude from the definition some prime loans that might have been classified as higher-priced under the proposed rule. The Board believes that this will decrease the economic impact of the final rule on small entities by limiting their compliance costs for prime loans the Board does not intend to cover under the higher-priced mortgage loan rules.

Second, the Board is providing an implementation period that responds to commenters' concerns about the time needed to comply with the final rule. The Board is also providing later effective dates for the escrow requirement than for the other parts of the final rule. As discussed above, the Board believes that these effective dates will decrease costs for small entities by providing them with sufficient time to come into compliance with the final rule's requirements.

The Board also notes that it is withdrawing two proposed rules for which small entity commenters expressed concern about the costs of compliance. The Board is withdrawing its proposal to prohibit creditors from paying a mortgage broker more than the consumer had agreed in advance that the broker would receive, and its proposal to require a servicer to provide to a consumer upon request a schedule of all specific fees and charges that may be imposed in connection with the servicing of the consumer's account.

The Board believes that these changes minimize the significant economic impact on small entities while still meeting the stated objectives of HOEPA and TILA.

**List of Subjects in 12 CFR Part 226**

Advertising, Consumer protection, Federal Reserve System, Mortgages, Reporting and recordkeeping requirements, Truth in lending.

**Authority and Issuance**

For the reasons set forth in the preamble, the Board amends Regulation Z, 12 CFR part 226, as set forth below:

**PART 226--TRUTH IN LENDING (REGULATION Z)**

1. The authority citation for part 226 is amended to read as follows:



**Authority:** 12 U.S.C. 3806; 15 U.S.C. 1604, 1637(c)(5), and 1639(l).

**Subpart A--General**

2. Section 226.1 is amended by revising paragraph (d)(5) to read as follows:

**§ 226.1 Authority, purpose, coverage, organization, enforcement and liability.**

\* \* \* \* \*

(d) \* \* \*

\* \* \* \* \*

(5) Subpart E contains special rules for mortgage transactions. Section 226.32 requires certain disclosures and provides limitations for loans that have rates and fees above specified amounts. Section 226.33 requires disclosures, including the total annual loan cost rate, for reverse mortgage transactions. Section 226.34 prohibits specific acts and practices in connection with mortgage transactions that are subject to § 226.32. Section 226.35 prohibits specific acts and practices in connection with higher-priced mortgage loans, as defined in § 226.35(a). Section 226.36 prohibits specific acts and practices in connection with credit secured by a consumer's principal dwelling.

\* \* \* \* \*

3. Section 226.2 is amended by revising paragraph (a)(6) to read as follows:

**§ 226.2 Definitions and Rules of Construction.**

(a) \* \* \*

(6) *"Business Day"* means a day on which the creditor's offices are open to the public for carrying on substantially all of its business functions. However, for purposes of rescission under §§ 226.15 and 226.23, and for purposes of § 226.19(a)(1)(ii) and § 226.31, the term means all calendar days except Sundays and the legal public holidays specified in 5 U.S.C. 6103(a), such as New Year's Day, the Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, and Christmas Day.

**Subpart B--Open-End Credit**

4. Section 226.16 is amended by revising paragraphs (d)(2) through (d)(4), and adding new paragraphs (d)(6) and (e) to read as follows:

**§ 226.16 Advertising.**

\* \* \* \* \*

(d) *Additional requirements for home-equity plans*

\* \* \* \* \*

(2) *Discounted and premium rates.* If an advertisement states an initial annual percentage rate that is not based on the index and margin used to make later rate adjustments in a variable-rate plan, the advertisement also shall state with equal prominence and in close proximity to the initial rate:

(i) The period of time such initial rate will be in effect; and

(ii) A reasonably current annual percentage rate that would have been in effect using the index and margin.

(3) *Balloon payment.* If an advertisement contains a statement of any minimum periodic payment and a balloon payment may result if only the minimum periodic payments are made, even if such a payment is uncertain or unlikely, the advertisement also shall state with equal prominence and in close proximity to the minimum periodic payment statement that a balloon payment may result, if applicable. n36e A balloon payment results if paying the minimum periodic payments does not fully amortize the outstanding balance by a specified date  [\*44600]  or time, and the con-

sumer is required to repay the entire outstanding balance at such time. If a balloon payment will occur when the consumer makes only the minimum payments required under the plan, an advertisement for such a program which contains any statement of any minimum periodic payment shall also state with equal prominence and in close proximity to the minimum periodic payment statement:

n36e [Reserved.]

(i) That a balloon payment will result; and

(ii) The amount and timing of the balloon payment that will result if the consumer makes only the minimum payments for the maximum period of time that the consumer is permitted to make such payments.

(4) *Tax implications.* An advertisement that states that any interest expense incurred under the home-equity plan is or may be tax deductible may not be misleading in this regard. If an advertisement distributed in paper form or through the Internet (rather than by radio or television) is for a home-equity plan secured by the consumer's principal dwelling, and the advertisement states that the advertised extension of credit may exceed the fair market value of the dwelling, the advertisement shall clearly and conspicuously state that:

(i) The interest on the portion of the credit extension that is greater than the fair market value of the dwelling is not tax deductible for Federal income tax purposes; and

(ii) The consumer should consult a tax adviser for further information regarding the deductibility of interest and charges.

\*   \*   \*   \*   \*

(6) *Promotional rates and payments* --(i) *Definitions.* The following definitions apply for purposes of paragraph (d)(6) of this section:

(A) *Promotional rate.* The term "promotional rate" means, in a variable-rate plan, any annual percentage rate that is not based on the index and margin that will be used to make rate adjustments under the plan, if that rate is less than a reasonably current annual percentage rate that would be in effect under the index and margin that will be used to make rate adjustments under the plan.

(B) *Promotional payment.* The term "promotional payment" means--

(*1*) For a variable-rate plan, any minimum payment applicable for a promotional period that:

(*i*) Is not derived by applying the index and margin to the outstanding balance when such index and margin will be used to determine other minimum payments under the plan; and

(*ii*) Is less than other minimum payments under the plan derived by applying a reasonably current index and margin that will be used to determine the amount of such payments, given an assumed balance.

(*2*) For a plan other than a variable-rate plan, any minimum payment applicable for a promotional period if that payment is less than other payments required under the plan given an assumed balance.

(C) *Promotional period.* A "promotional period" means a period of time, less than the full term of the loan, that the promotional rate or promotional payment may be applicable.

(ii) *Stating the promotional period and post-promotional rate or payments.* If any annual percentage rate that may be applied to a plan is a promotional rate, or if any payment applicable to a plan is a promotional payment, the following must be disclosed in any advertisement, other than television or radio advertisements, in a clear and conspicuous manner with equal prominence and in close proximity to each listing of the promotional rate or payment:

(A) The period of time during which the promotional rate or promotional payment will apply;

(B) In the case of a promotional rate, any annual percentage rate that will apply under the plan. If such rate is variable, the annual percentage rate must be disclosed in accordance with the accuracy standards in §§ 226.5b, or 226.16(b)(1)(ii) as applicable; and

(C) In the case of a promotional payment, the amounts and time periods of any payments that will apply under the plan. In variable-rate transactions, payments that will be determined based on application of an index and margin shall be disclosed based on a reasonably current index and margin.

(iii) *Envelope excluded.* The requirements in paragraph (d)(6)(ii) of this section do not apply to an envelope in which an application or solicitation is mailed, or to a banner advertisement or pop-up advertisement linked to an application or solicitation provided electronically.

(e) *Alternative disclosures--television or radio advertisements.* An advertisement for a home-equity plan subject to the requirements of § 226.5b made through television or radio stating any of the terms requiring additional disclosures under paragraph (b) or (d)(1) of this section may alternatively comply with paragraph (b) or (d)(1) of this section by stating the information required by paragraph (b)(2) of this section or paragraph (d)(1)(ii) of this section, as applicable, and listing a toll-free telephone number, or any telephone number that allows a consumer to reverse the phone charges when calling for information, along with a reference that such number may be used by consumers to obtain additional cost information.

**Subpart C--Closed-End Credit**

5. Section 226.17 is amended by revising paragraphs (b) and (f) to read as follows:

**§ 226.17 General disclosure requirements.**

\* \* \* \* \*

(b) *Time of disclosures.* The creditor shall make disclosures before consummation of the transaction. In certain mortgage transactions, special timing requirements are set forth in § 226.19(a). In certain variable-rate transactions, special timing requirements for variable-rate disclosures are set forth in § 226.19(b) and § 226.20(c). In certain transactions involving mail or telephone orders or a series of sales, the timing of the disclosures may be delayed in accordance with paragraphs (g) and (h) of this section.

\* \* \* \* \*

(f) *Early disclosures.* If disclosures required by this subpart are given before the date of consummation of a transaction and a subsequent event makes them inaccurate, the creditor shall disclose before consummation (except that, for certain mortgage transactions, § 226.19(a)(2) permits redisclosure no later than consummation or settlement, whichever is later). n39

n39 [Reserved.]

\* \* \* \* \*

6. Section 226.19 is amended by revising the heading and paragraph (a)(1) to read as follows:

**§ 226.19 Certain mortgage and variable-rate transactions.**

(a) *Mortgage transactions subject to RESPA* --(1)(i) *Time of disclosures.* In a mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) that is secured by the consumer's principal dwelling, other than a home equity line of credit subject to § 226.5b, the creditor shall make good faith estimates of the disclosures required by § 226.18 before consummation, or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier.

(ii) *Imposition of fees.* Except as provided in paragraph (a)(1)(iii) of this  [*44601]  section, neither a creditor nor any other person may impose a fee on the consumer in connection with the consumer's application for a mortgage transaction subject to paragraph (a)(1)(i) of this section before the consumer has received the disclosures required by paragraph (a)(1)(i) of this section. If the disclosures are mailed to the consumer, the consumer is considered to have received them three business days after they are mailed.

(iii) *Exception to fee restriction.* A creditor or other person may impose a fee for obtaining the consumer's credit history before the consumer has received the disclosures required by paragraph (a)(1)(i) of this section, provided the fee is *bona fide* and reasonable in amount.

\* \* \* \* \*

7. Section 226.23 is amended by revising footnote 48 to paragraph (a)(3) to read "The term 'material disclosures' means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§ 226.32(c) and (d) and 226.35(b)(2)."

8. Section 226.24 is amended by redesignating paragraphs (b) through (d) as paragraphs (c) through (e), respectively, adding new paragraph (b), revising newly designated paragraphs (c) through (e), removing and reserving footnote 49, and adding new paragraphs (f) through (i), to read as follows:

§ 226.24 Advertising.

\* \* \* \* \*

(b) *Clear and conspicuous standard.* Disclosures required by this section shall be made clearly and conspicuously.

(c) *Advertisement of rate of finance charge.* If an advertisement states a rate of finance charge, it shall state the rate as an "annual percentage rate," using that term. If the annual percentage rate may be increased after consummation, the advertisement shall state that fact. If an advertisement is for credit not secured by a dwelling, the advertisement shall not state any other rate, except that a simple annual rate or periodic rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate. If an advertisement is for credit secured by a dwelling, the advertisement shall not state any other rate, except that a simple annual rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate.

(d) *Advertisement of terms that require additional disclosures* --(1) *Triggering terms.* If any of the following terms is set forth in an advertisement, the advertisement shall meet the requirements of paragraph (d)(2) of this section:

(i) The amount or percentage of any downpayment.

(ii) The number of payments or period of repayment.

(iii) The amount of any payment.

(iv) The amount of any finance charge.

(2) *Additional terms.* An advertisement stating any of the terms in paragraph (d)(1) of this section shall state the following terms, n49 as applicable (an example of one or more typical extensions of credit with a statement of all the terms applicable to each may be used):

n49 [Reserved.]

(i) The amount or percentage of the downpayment.

(ii) The terms of repayment, which reflect the repayment obligations over the full term of the loan, including any balloon payment.

(iii) The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

(e) *Catalogs or other multiple-page advertisements; electronic advertisements* --(1) If a catalog or other multiple-page advertisement, or an electronic advertisement (such as an advertisement appearing on an Internet Web site), gives information in a table or schedule in sufficient detail to permit determination of the disclosures required by paragraph (d)(2) of this section, it shall be considered a single advertisement if--

(i) The table or schedule is clearly and conspicuously set forth; and

(ii) Any statement of the credit terms in paragraph (d)(1) of this section appearing anywhere else in the catalog or advertisement clearly refers to the page or location where the table or schedule begins.

(2) A catalog or other multiple-page advertisement or an electronic advertisement (such as an advertisement appearing on an Internet Web site) complies with paragraph (d)(2) of this section if the table or schedule of terms includes all appropriate disclosures for a representative scale of amounts up to the level of the more commonly sold higher-priced property or services offered.

(f) *Disclosure of Rates and Payments in Advertisements for Credit Secured by a Dwelling.*

(1) *Scope.* The requirements of this paragraph apply to any advertisement for credit secured by a dwelling, other than television or radio advertisements, including promotional materials accompanying applications.

(2) *Disclosure of rates* --(i) *In general.* If an advertisement for credit secured by a dwelling states a simple annual rate of interest and more than one simple annual rate of interest will apply over the term of the advertised loan, the advertisement shall disclose in a clear and conspicuous manner:

(A) Each simple annual rate of interest that will apply. In variable-rate transactions, a rate determined by adding an index and margin shall be disclosed based on a reasonably current index and margin;

(B) The period of time during which each simple annual rate of interest will apply; and

(C) The annual percentage rate for the loan. If such rate is variable, the annual percentage rate shall comply with the accuracy standards in §§ 226.17(c) and 226.22.

(ii) *Clear and conspicuous requirement.* For purposes of paragraph (f)(2)(i) of this section, clearly and conspicuously disclosed means that the required information in paragraphs (f)(2)(i)(A) through (C) shall be disclosed with equal prominence and in close proximity to any advertised rate that triggered the required disclosures. The required information in paragraph (f)(2)(i)(C) may be disclosed with greater prominence than the other information.

(3) *Disclosure of payments* --(i) *In general.* In addition to the requirements of paragraph (c) of this section, if an advertisement for credit secured by a dwelling states the amount of any payment, the advertisement shall disclose in a clear and conspicuous manner:

(A) The amount of each payment that will apply over the term of the loan, including any balloon payment. In variable-rate transactions, payments that will be determined based on the application of the sum of an index and margin shall be disclosed based on a reasonably current index and margin;

(B) The period of time during which each payment will apply; and

(C) In an advertisement for credit secured by a first lien on a dwelling, the fact that the payments do not include amounts for taxes and insurance premiums, if applicable, and that the actual payment obligation will be greater.

(ii) *Clear and conspicuous requirement.* For purposes of paragraph (f)(3)(i) of this section, a clear and conspicuous disclosure means that the  [*44602]   required information in paragraphs (f)(3)(i)(A) and (B) shall be disclosed with equal prominence and in close proximity to any advertised payment that triggered the required disclosures, and that the required information in paragraph (f)(3)(i)(C) shall be disclosed with prominence and in close proximity to the advertised payments.

(4) *Envelope excluded.* The requirements in paragraphs (f)(2) and (f)(3) of this section do not apply to an envelope in which an application or solicitation is mailed, or to a banner advertisement or pop-up advertisement linked to an application or solicitation provided electronically.

(g) *Alternative disclosures--television or radio advertisements.* An advertisement made through television or radio stating any of the terms requiring additional disclosures under paragraph (d)(2) of this section may comply with paragraph (d)(2) of this section either by:

(1) Stating clearly and conspicuously each of the additional disclosures required under paragraph (d)(2) of this section; or

(2) Stating clearly and conspicuously the information required by paragraph (d)(2)(iii) of this section and listing a toll-free telephone number, or any telephone number that allows a consumer to reverse the phone charges when calling for information, along with a reference that such number may be used by consumers to obtain additional cost information.

(h) *Tax implications.* If an advertisement distributed in paper form or through the Internet (rather than by radio or television) is for a loan secured by the consumer's principal dwelling, and the advertisement states that the advertised extension of credit may exceed the fair market value of the dwelling, the advertisement shall clearly and conspicuously state that:

(1) The interest on the portion of the credit extension that is greater than the fair market value of the dwelling is not tax deductible for Federal income tax purposes; and

(2) The consumer should consult a tax adviser for further information regarding the deductibility of interest and charges.

(i) *Prohibited acts or practices in advertisements for credit secured by a dwelling.* The following acts or practices are prohibited in advertisements for credit secured by a dwelling:

(1) *Misleading advertising of "fixed" rates and payments.* Using the word "fixed" to refer to rates, payments, or the credit transaction in an advertisement for variable-rate transactions or other transactions where the payment will increase, unless:

(i) In the case of an advertisement solely for one or more variable-rate transactions,

(A) The phrase "Adjustable-Rate Mortgage," "Variable-Rate Mortgage," or "ARM" appears in the advertisement before the first use of the word "fixed" and is at least as conspicuous as any use of the word "fixed" in the advertisement; and

(B) Each use of the word "fixed" to refer to a rate or payment is accompanied by an equally prominent and closely proximate statement of the time period for which the rate or payment is fixed, and the fact that the rate may vary or the payment may increase after that period;

(ii) In the case of an advertisement solely for non-variable-rate transactions where the payment will increase (*e.g.*, a stepped-rate mortgage transaction with an initial lower payment), each use of the word "fixed" to refer to the payment is accompanied by an equally prominent and closely proximate statement of the time period for which the payment is fixed, and the fact that the payment will increase after that period; or

(iii) In the case of an advertisement for both variable-rate transactions and non-variable-rate transactions,

(A) The phrase "Adjustable-Rate Mortgage," "Variable-Rate Mortgage," or "ARM" appears in the advertisement with equal prominence as any use of the term "fixed," "Fixed-Rate Mortgage," or similar terms; and

(B) Each use of the word "fixed" to refer to a rate, payment, or the credit transaction either refers solely to the transactions for which rates are fixed and complies with paragraph (i)(1)(ii) of this section, if applicable, or, if it refers to the variable-rate transactions, is accompanied by an equally prominent and closely proximate statement of the time period for which the rate or payment is fixed, and the fact that the rate may vary or the payment may increase after that period.

(2) *Misleading comparisons in advertisements.* Making any comparison in an advertisement between actual or hypothetical credit payments or rates and any payment or simple annual rate that will be available under the advertised product for a period less than the full term of the loan, unless:

(i) *In general.* The advertisement includes a clear and conspicuous comparison to the information required to be disclosed under sections 226.24(f)(2) and (3); and

(ii) *Application to variable-rate transactions.* If the advertisement is for a variable-rate transaction, and the advertised payment or simple annual rate is based on the index and margin that will be used to make subsequent rate or payment adjustments over the term of the loan, the advertisement includes an equally prominent statement in close proximity to the payment or rate that the payment or rate is subject to adjustment and the time period when the first adjustment will occur.

(3) *Misrepresentations about government endorsement.* Making any statement in an advertisement that the product offered is a "government loan program", "government-supported loan", or is otherwise endorsed or sponsored by any federal, state, or local government entity, unless the advertisement is for an FHA loan, VA loan, or similar loan program that is, in fact, endorsed or sponsored by a federal, state, or local government entity.

(4) *Misleading use of the current lender's name.* Using the name of the consumer's current lender in an advertisement that is not sent by or on behalf of the consumer's current lender, unless the advertisement:

(i) Discloses with equal prominence the name of the person or creditor making the advertisement; and

(ii) Includes a clear and conspicuous statement that the person making the advertisement is not associated with, or acting on behalf of, the consumer's current lender.

(5) *Misleading claims of debt elimination.* Making any misleading claim in an advertisement that the mortgage product offered will eliminate debt or result in a waiver or forgiveness of a consumer's existing loan terms with, or obligations to, another creditor.

(6) *Misleading use of the term "counselor".* Using the term "counselor" in an advertisement to refer to a for-profit mortgage broker or mortgage creditor, its employees, or persons working for the broker or creditor that are involved in offering, originating or selling mortgages.

(7) *Misleading foreign-language advertisements.* Providing information about some trigger terms or required disclosures, such as an initial rate or payment, only in a foreign language in an advertisement, but providing information about other trigger terms or required disclosures, such as information about the fully-indexed rate or fully amortizing payment, only in English in the same advertisement.

**Subpart E--Special Rules for Certain Home Mortgage Transactions**

9. Section 226.32 is amended by revising paragraphs (d)(6) and (d)(7) to read as follows:   [*44603]

**§ 226.32 Requirements for certain closed-end home mortgages.**

\* \* \* \* \*

(d) \* \* \*

(6) *Prepayment penalties.* Except as allowed under paragraph (d)(7) of this section, a penalty for paying all or part of the principal before the date on which the principal is due. A prepayment penalty includes computing a refund of unearned interest by a method that is less favorable to the consumer than the actuarial method, as defined by section 933(d) of the Housing and Community Development Act of 1992, 15 U.S.C. 1615(d).

(7) *Prepayment penalty exception.* A mortgage transaction subject to this section may provide for a prepayment penalty (including a refund calculated according to the rule of 78s) otherwise permitted by law if, under the terms of the loan:

(i) The penalty will not apply after the two-year period following consummation;

(ii) The penalty will not apply if the source of the prepayment funds is a refinancing by the creditor or an affiliate of the creditor;

(iii) At consummation, the consumer's total monthly debt payments (including amounts owed under the mortgage) do not exceed 50 percent of the consumer's monthly gross income, as verified in accordance with § 226.34(a)(4)(ii); and

(iv) The amount of the periodic payment of principal or interest or both may not change during the four-year period following consummation.

\* \* \* \* \*

10. Section 226.34 is amended by revising the heading and paragraph (a)(4) to read as follows:

**§ 226.34 Prohibited acts or practices in connection with credit subject to § 226.32.**

(a) \* \* \*

(4) *Repayment ability.* Extend credit subject to § 226.32 to a consumer based on the value of the consumer's collateral without regard to the consumer's repayment ability as of consummation, including the consumer's current and reasonably expected income, employment, assets other than the collateral, current obligations, and mortgage-related obligations.

(i) *Mortgage-related obligations.* For purposes of this paragraph (a)(4), mortgage-related obligations are expected property taxes, premiums for mortgage-related insurance required by the creditor as set forth in § 226.35(b)(3)(i), and similar expenses.

(ii) *Verification of repayment ability.* Under this paragraph (a)(4) a creditor must verify the consumer's repayment ability as follows:

(A) A creditor must verify amounts of income or assets that it relies on to determine repayment ability, including expected income or assets, by the consumer's Internal Revenue Service Form W-2, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets.

(B) Notwithstanding paragraph (a)(4)(ii)(A), a creditor has not violated paragraph (a)(4)(ii) if the amounts of income and assets that the creditor relied upon in determining repayment ability are not materially greater than the amounts of the consumer's income or assets that the creditor could have verified pursuant to paragraph (a)(4)(ii)(A) at the time the loan was consummated.

(C) A creditor must verify the consumer's current obligations.

(iii) *Presumption of compliance.* A creditor is presumed to have complied with this paragraph (a)(4) with respect to a transaction if the creditor:

(A) Verifies the consumer's repayment ability as provided in paragraph (a)(4)(ii);

(B) Determines the consumer's repayment ability using the largest payment of principal and interest scheduled in the first seven years following consummation and taking into account current obligations and mortgage-related obligations as defined in paragraph (a)(4)(i); and

(C) Assesses the consumer's repayment ability taking into account at least one of the following: The ratio of total debt obligations to income, or the income the consumer will have after paying debt obligations.

(iv) *Exclusions from presumption of compliance.* Notwithstanding the previous paragraph, no presumption of compliance is available for a transaction for which:

(A) The regular periodic payments for the first seven years would cause the principal balance to increase; or

(B) The term of the loan is less than seven years and the regular periodic payments when aggregated do not fully amortize the outstanding principal balance.

(v) *Exemption.* This paragraph (a)(4) does not apply to temporary or "bridge" loans with terms of twelve months or less, such as a loan to purchase a new dwelling where the consumer plans to sell a current dwelling within twelve months.

\* \* \* \* \*

11. New § 226.35 is added to read as follows:

### § 226.35 Prohibited acts or practices in connection with higher-priced mortgage loans.

(a) *Higher-priced mortgage loans* --(1) For purposes of this section, a higher-priced mortgage loan is a consumer credit transaction secured by the consumer's principal dwelling with an annual percentage rate that exceeds the average prime offer rate for a comparable transaction as of the date the interest rate is set by 1.5 or more percentage points for loans secured by a first lien on a dwelling, or by 3.5 or more percentage points for loans secured by a subordinate lien on a dwelling.

(2) "Average prime offer rate" means an annual percentage rate that is derived from average interest rates, points, and other loan pricing terms currently offered to consumers by a representative sample of creditors for mortgage transactions that have low-risk pricing characteristics. The Board publishes average prime offer rates for a broad range of types of transactions in a table updated at least weekly as well as the methodology the Board uses to derive these rates.

(3) Notwithstanding paragraph (a)(1) of this section, the term "higher-priced mortgage loan" does not include a transaction to finance the initial construction of a dwelling, a temporary or "bridge" loan with a term of twelve months or less, such as a loan to purchase a new dwelling where the consumer plans to sell a current dwelling within twelve months, a reverse-mortgage transaction subject to § 226.33, or a home equity line of credit subject to § 226.5b.

(b) *Rules for higher-priced mortgage loans.* Higher-priced mortgage loans are subject to the following restrictions:

(1) *Repayment ability.* A creditor shall not extend credit based on the value of the consumer's collateral without regard to the consumer's repayment ability as of consummation as provided in § 226.34(a)(4).

(2) *Prepayment penalties.* A loan may not include a penalty described by § 226.32(d)(6) unless:

(i) The penalty is otherwise permitted by law, including § 226.32(d)(7) if the loan is a mortgage transaction described in § 226.32(a); and

(ii) Under the terms of the loan--

(A) The penalty will not apply after the two-year period following consummation;

(B) The penalty will not apply if the source of the prepayment funds is a refinancing by the creditor or an affiliate of the creditor; and

(C) The amount of the periodic payment of principal or interest or both  [*44604]   may not change during the four-year period following consummation.

(3) *Escrows* --(i) *Failure to escrow for property taxes and insurance.* Except as provided in paragraph (b)(3)(ii) of this section, a creditor may not extend a loan secured by a first lien on a principal dwelling unless an escrow account is established before consummation for payment of property taxes and premiums for mortgage-related insurance required by the creditor, such as insurance against loss of or damage to property, or against liability arising out of the ownership or use of the property, or insurance protecting the creditor against the consumer's default or other credit loss.

(ii) *Exemptions for loans secured by shares in a cooperative and for certain condominium units* --(A) Escrow accounts need not be established for loans secured by shares in a cooperative; and

(B) Insurance premiums described in paragraph (b)(3)(i) of this section need not be included in escrow accounts for loans secured by condominium units, where the condominium association has an obligation to the condominium unit owners to maintain a master policy insuring condominium units.

(iii) *Cancellation.* A creditor or servicer may permit a consumer to cancel the escrow account required in paragraph (b)(3)(i) of this section only in response to a consumer's dated written request to cancel the escrow account that is received no earlier than 365 days after consummation.

(iv) *Definition of escrow account.* For purposes of this section, "escrow account" shall have the same meaning as in 24 CFR 3500.17(b) as amended.

(4) *Evasion; open-end credit.* In connection with credit secured by a consumer's principal dwelling that does not meet the definition of open-end credit in § 226.2(a)(20), a creditor shall not structure a home-secured loan as an open-end plan to evade the requirements of this section.

12. New § 226.36 is added to read as follows:

### § 226.36 Prohibited acts or practices in connection with credit secured by a consumer's principal dwelling.

(a) *Mortgage broker defined.* For purposes of this section, the term "mortgage broker" means a person, other than an employee of a creditor, who for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person. The term includes a person meeting this definition, even if the consumer credit obligation is initially payable to such person, unless the person provides the funds for the transaction at consummation out of the person's own resources, out of deposits held by the person, or by drawing on a bona fide warehouse line of credit.

(b) *Misrepresentation of value of consumer's dwelling* --(1) *Coercion of appraiser.* In connection with a consumer credit transaction secured by a consumer's principal dwelling, no creditor or mortgage broker, and no affiliate of a creditor or mortgage broker shall directly or indirectly coerce, influence, or otherwise encourage an appraiser to misstate or misrepresent the value of such dwelling.

(i) Examples of actions that violate this paragraph (b)(1) include:

(A) Implying to an appraiser that current or future retention of the appraiser depends on the amount at which the appraiser values a consumer's principal dwelling;

(B) Excluding an appraiser from consideration for future engagement because the appraiser reports a value of a consumer's principal dwelling that does not meet or exceed a minimum threshold;

(C) Telling an appraiser a minimum reported value of a consumer's principal dwelling that is needed to approve the loan;

(D) Failing to compensate an appraiser because the appraiser does not value a consumer's principal dwelling at or above a certain amount; and

(E) Conditioning an appraiser's compensation on loan consummation.

(ii) Examples of actions that do not violate this paragraph (b)(1) include:

(A) Asking an appraiser to consider additional information about a consumer's principal dwelling or about comparable properties;

(B) Requesting that an appraiser provide additional information about the basis for a valuation;

(C) Requesting that an appraiser correct factual errors in a valuation;

(D) Obtaining multiple appraisals of a consumer's principal dwelling, so long as the creditor adheres to a policy of selecting the most reliable appraisal, rather than the appraisal that states the highest value;

(E) Withholding compensation from an appraiser for breach of contract or substandard performance of services as provided by contract; and

(F) Taking action permitted or required by applicable federal or state statute, regulation, or agency guidance.

(2) *When extension of credit prohibited.* In connection with a consumer credit transaction secured by a consumer's principal dwelling, a creditor who knows, at or before loan consummation, of a violation of paragraph (b)(1) of this section in connection with an appraisal shall not extend credit based on such appraisal unless the creditor documents that it has acted with reasonable diligence to determine that the appraisal does not materially misstate or misrepresent the value of such dwelling.

(3) *Appraiser defined.* As used in this paragraph (b), an appraiser is a person who engages in the business of providing assessments of the value of dwellings. The term "appraiser" includes persons that employ, refer, or manage appraisers and affiliates of such persons.

(c) *Servicing practices.* (1) In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall--

(i) Fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency, or except as provided in paragraph (c)(2) of this section;

(ii) Impose on the consumer any late fee or delinquency charge in connection with a payment, when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on its due date or within any applicable grace period; or

(iii) Fail to provide, within a reasonable time after receiving a request from the consumer or any person acting on behalf of the consumer, an accurate statement of the total outstanding balance that would be required to satisfy the consumer's obligation in full as of a specified date.

(2) If a servicer specifies in writing requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, the servicer shall credit the payment as of 5 days after receipt.

(3) For purposes of this paragraph (c), the terms "servicer" and "servicing" have the same meanings as provided in 24 CFR 3500.2(b), as amended.

(d) This section does not apply to a home equity line of credit subject to § 226.5b.

**Supplement I to Part 226--Official Staff Interpretations**

**Subpart A--General**

13. In Supplement I to Part 226, under *Section 226.1--Authority, Purpose, Coverage, Organization, Enforcement* [*44605] *and Liability*, new headings *1(d) Organization* and *Paragraph 1(d)(5)*, and new paragraph 1(d)(5)-1 are added to read as follows:

*Section 226.1--Authority, Purpose, Coverage, Organization, Enforcement and Liability*

\* \* \* \* \*

*1(d) Organization.*

*Paragraph 1(d)(5).*

1. *Effective dates.* The Board's revisions to Regulation Z published on July 30, 2008 (the "final rules"), apply to covered loans (including refinance loans and assumptions considered new transactions under 226.20), for which the creditor receives an application on or after October 1, 2009, except for the final rules on advertising, escrows, and loan servicing. The final rules on escrows in § 226.35(b)(3) are effective for covered loans, (including refinancings and assumptions in 226.20) for which the creditor receives an application on or after April 1, 2010; but for such loans secured by manufactured housing on or after October 1, 2010. The final rules applicable to servicers in § 226.36(c) apply to all covered loans serviced on or after October 1, 2009. The final rules on advertising apply to advertisements occurring on or after October 1, 2009. For example, a radio ad occurs on the date it is first broadcast; a solicitation occurs on the date it is mailed to the consumer. The following examples illustrate the application of the effective dates for the final rules.

   i. *General.* A refinancing or assumption as defined in 226.20(a) or (b) is a new transaction and is covered by a provision of the final rule if the creditor receives an application for the transaction on or after that provision's effective date. For example, if a creditor receives an application for a refinance loan covered by 226.35(a) on or after October 1, 2009, and the refinance loan is consummated on October 15, 2009, the provision restricting prepayment penalties in § 226.35(b)(2) applies. However, If the transaction were a modification of an existing obligation's terms that does not constitute a refinance loan under § 226.20(a), the final rules, including for example the restriction on prepayment penalties would not apply.

   ii. *Escrows.* Assume a consumer applies for a refinance loan to be secured by a dwelling (that is not a manufactured home) on March 15, 2010, and the loan is consummated on April 2, 2010, the escrow rule in 226.35(b)(3) does not apply.

   iii. *Servicing.* Assume that a consumer applies for a new loan on August 1, 2009. The loan is consummated on September 1, 2009. The servicing rules in 226.36(c) apply to the servicing of that loan as of October 1, 2009.

14. In Supplement I to Part 226, under Section *226.2--Definitions and Rules of Construction, 2(a) Definitions, 2(a)(6) Business day,* paragraph 2(a)(6)-2 is revised, and under *2(a)(24) Residential mortgage transaction,* paragraphs 2(a)(24)-1 and 2(a)(24)-5.ii are revised, to read as follows:

*Section 226.2--Definitions and Rules of Construction*

   *2(a) Definitions.*

   \* \* \* \* \*

   *2(a)(6) Business day.*

   \* \* \* \* \*

   2. *Recission rule.* A more precise rule for what is a business day (all calendar days except Sundays and the federal legal holidays listed in 5 U.S.C. 6103(a)) applies when the right of rescission, the receipt of disclosures for certain mortgage transactions under section 226.19(a)(1)(ii), or mortgages subject to section 226.32 are involved. (See also comment 31(c)(1)-1.) Four federal legal holidays are identified in 5 U.S.C. 6103(a) by a specific date: New Year's Day, January 1; Independence Day, July 4; Veterans Day, November 11; and Christmas Day, December 25. When one of these holidays (July 4, for example) falls on a Saturday, federal offices and other entities might observe the holiday on the preceding Friday (July 3). The observed holiday (in the example, July 3) is a business day for purposes of rescission, the receipt of disclosures for certain mortgage transactions under section 226.19(a)(1)(ii), or the delivery of disclosures for certain high-cost mortgages covered by section 226.32.

\* \* \* \* \*

*2(a)(24) Residential mortgage transaction.*

1. *Relation to other sections.* This term is important in five provisions in the regulation:

i. § 226.4(c)(7)--exclusions from the finance charge.

ii. § 226.15(f)--exemption from the right of rescission.

iii. § 226.18(q)--whether or not the obligation is assumable.

iv. § 226.20(b)--disclosure requirements for assumptions.

v. § 226.23(f)--exemption from the right of rescission.

\* \* \* \* \*

5. *Acquisition.* \* \* \*

\* \* \* \* \*

ii. Examples of new transactions involving a previously acquired dwelling include the financing of a balloon payment due under a land sale contract and an extension of credit made to a joint owner of property to buy out the other joint owner's interest. In these instances, disclosures are not required under § 226.18(q) (assumability policies). However, the rescission rules of §§ 226.15 and 226.23 do apply to these new transactions.

\* \* \* \* \*

**Subpart B--Open-End Credit**

15. In Supplement I to Part 226, under *Section 226.16--Advertising*, paragraph 16-1 is revised, paragraph 16-2 is redesignated as paragraph 16-6, and new paragraphs 16-2 through 16-5 and 16-7 are added; under *16(d) Additional requirements for home-equity plans*, paragraph 16(d)-3 is revised, paragraphs 16(d)-5, 16(d)-6, and 16(d)-7 are redesignated as paragraphs 16(d)-7, 16(d)-8, and 16(d)-9, respectively, new paragraphs 16(d)-5 and 16(d)-6 are added, and newly designated paragraphs 16(d)-7 and 16(d)-9 are revised; and new heading *16(e) Alternative disclosures--television or radio advertisements* is added, and new paragraphs 16(e)-1 and 16(e)-2 are added, to read as follows:

*Section 226.16--Advertising*

1. *Clear and conspicuous standard--general.* Section 226.16 is subject to the general "clear and conspicuous" standard for subpart B (*see* § 226.5(a)(1)) but prescribes no specific rules for the format of the necessary disclosures, aside from the format requirements related to the disclosure of a promotional rate under § 226.16(d)(6). Aside from the terms described in § 226.16(d)(6), the credit terms need not be printed in a certain type size nor need they appear in any particular place in the advertisement.

2. *Clear and conspicuous standard--promotional rates or payments for home-equity plans.* For purposes of § 226.16(d)(6), a clear and conspicuous disclosure means that the required information in § 226.16(d)(6)(ii)(A)-(C) is disclosed with equal prominence and in close proximity to the promotional rate or payment to which it applies. If the information in § 226.16(d)(6)(ii)(A)-(C) is the same type size and is located immediately next to or directly above or below the promotional rate or payment to which it applies, without any intervening text or graphical displays, the disclosures would be deemed to be equally prominent and in close proximity. Notwithstanding the above, for electronic advertisements that disclose promotional rates or payments, compliance with the requirements of § 226.16(c) is deemed to satisfy the clear and conspicuous standard.

3. *Clear and conspicuous standard--Internet advertisements for home-equity plans.* For purposes of this section, a clear and conspicuous disclosure for visual text advertisements on the Internet for home-equity plans subject to the requirements of § 226.5b means that the required disclosures are not obscured by techniques such as graphical displays, shading, coloration, or other devices and comply with all other requirements for clear and conspicuous disclosures under § 226.16(d). *See also* comment 16(c)(1)-2.

4. *Clear and conspicuous standard--televised advertisements for home-equity plans.* For purposes of this section, including alternative disclosures as provided for by § 226.16(e), a clear and conspicuous disclosure in the context of visual text advertisements on television for home-equity plans subject to the requirements of § 226.5b means that the required disclosures are not obscured by techniques such as graphical displays, shading, coloration, or other devices, are displayed in a manner that allows for a consumer to read the information required to be disclosed, and comply with all other requirements for clear and conspicuous disclosures under § 226.16(d). For example, very fine print in a television advertisement would not meet the clear and conspicuous standard if consumers cannot see and read the information required to be disclosed.  [*44606]

5. *Clear and conspicuous standard--oral advertisements for home-equity plans.* For purposes of this section, including alternative disclosures as provided for by § 226.16(e), a clear and conspicuous disclosure in the context of an oral advertisement for home-equity plans subject to the requirements of § 226.5b, whether by radio, television, the Internet, or other medium, means that the required disclosures are given at a speed and volume sufficient for a consumer to hear and comprehend them. For example, information stated very rapidly at a low volume in a radio or television advertisement would not meet the clear and conspicuous standard if consumers cannot hear and comprehend the information required to be disclosed.

6. *Expressing the annual percentage rate in abbreviated form.* * * *

7. *Effective date.* For guidance on the applicability of the Board's revisions to § 226.16 published on July 30, 2008, see comment 1(d)(5)-1.

\* \* \* \* \*

*16(d) Additional requirements for home-equity plans.*

\* \* \* \* \*

3. *Statements of tax deductibility.* An advertisement that refers to deductibility for tax purposes is not misleading if it includes a statement such as "consult a tax advisor regarding the deductibility of interest." An advertisement distributed in paper form or through the Internet (rather than by radio or television) that states that the advertised extension of credit may exceed the fair market value of the consumer's dwelling is not misleading if it clearly and conspicuously states the required information in §§ 226.16(d)(4)(i) and (ii).

\* \* \* \* \*

5. *Promotional rates and payments in advertisements for home-equity plans.* Section 226.16(d)(6) requires additional disclosures for promotional rates or payments.

i. *Variable-rate plans.* In advertisements for variable-rate plans, if the advertised annual percentage rate is based on (or the advertised payment is derived from) the index and margin that will be used to make rate (or payment) adjustments over the term of the loan, then there is no promotional rate or promotional payment. If, however, the advertised annual percentage rate is not based on (or the advertised payment is not derived from) the index and margin that will be used to make rate (or payment) adjustments, and a reasonably current application of the index and margin would result in a higher annual percentage rate (or, given an assumed balance, a higher payment) then there is a promotional rate or promotional payment.

ii. *Equal prominence, close proximity.* Information required to be disclosed in § 226.16(d)(6)(ii) that is immediately next to or directly above or below the promotional rate or payment (but not in a footnote) is deemed to be closely proximate to the listing. Information required to be disclosed in § 226.16(d)(6)(ii) that is in the same type size as the promotional rate or payment is deemed to be equally prominent.

iii. *Amounts and time periods of payments.* Section 226.16(d)(6)(ii)(C) requires disclosure of the amount and time periods of any payments that will apply under the plan. This section may require disclosure of several payment amounts, including any balloon payment. For example, if an advertisement for a home-equity plan offers a $ 100,000 five-year line of credit and assumes that the entire line is drawn resulting in a minimum payment of $ 800 per month for the first six months, increasing to $ 1,000 per month after month six, followed by a $ 50,000 balloon payment after five years, the advertisement must disclose the amount and time period of each of the two monthly payment streams, as well as the amount and timing of the balloon payment, with equal prominence and in close proximity to the promotional

payment. However, if the final payment could not be more than twice the amount of other minimum payments, the final payment need not be disclosed.

   iv. *Plans other than variable-rate plans.* For a plan other than a variable-rate plan, if an advertised payment is calculated in the same way as other payments based on an assumed balance, the fact that the minimum payment could increase solely if the consumer made an additional draw does not make the payment a promotional payment. For example, if a payment of $ 500 results from an assumed $ 10,000 draw, and the payment would increase to $ 1,000 if the consumer made an additional $ 10,000 draw, the payment is not a promotional payment.

   v. *Conversion option.* Some home-equity plans permit the consumer to repay all or part of the balance during the draw period at a fixed rate (rather than a variable rate) and over a specified time period. The fixed-rate conversion option does not, by itself, make the rate or payment that would apply if the consumer exercised the fixed-rate conversion option a promotional rate or payment.

   vi. *Preferred-rate provisions.* Some home-equity plans contain a preferred-rate provision, where the rate will increase upon the occurrence of some event, such as the consumer-employee leaving the creditor's employ, the consumer closing an existing deposit account with the creditor, or the consumer revoking an election to make automated payments. A preferred-rate provision does not, by itself, make the rate or payment under the preferred-rate provision a promotional rate or payment.

   6. *Reasonably current index and margin.* For the purposes of this section, an index and margin is considered reasonably current if:

   i. For direct mail advertisements, it was in effect within 60 days before mailing;

   ii. For advertisements in electronic form it was in effect within 30 days before the advertisement is sent to a consumer's e-mail address, or in the case of an advertisement made on an Internet Web site, when viewed by the public; or

   iii. For printed advertisements made available to the general public, including ones contained in a catalog, magazine, or other generally available publication, it was in effect within 30 days before printing.

   7. *Relation to other sections.* Advertisements for home-equity plans must comply with all provisions in § 226.16 not solely the rules in § 226.16(d). If an advertisement contains information (such as the payment terms) that triggers the duty under § 226.16(d) to state the annual percentage rate, the additional disclosures in § 226.16(b) must be provided in the advertisement. While § 226.16(d) does not require a statement of fees to use or maintain the plan (such as membership fees and transaction charges), such fees must be disclosed under § 226.16(b)(1) and (3).

   \*   \*   \*   \*   \*

   9. *Balloon payment.* See comment 5b(d)(5)(ii)-3 for information not required to be stated in advertisements, and on situations in which the balloon payment requirement does not apply.

   *16(e) Alternative disclosures--television or radio advertisements.*

   1. *Multi-purpose telephone number.* When an advertised telephone number provides a recording, disclosures should be provided early in the sequence to ensure that the consumer receives the required disclosures. For example, in providing several options--such as providing directions to the advertiser's place of business--the option allowing the consumer to request disclosures should be provided early in the telephone message to ensure that the option to request disclosures is not obscured by other information.

   2. *Statement accompanying telephone number.* Language must accompany a telephone number indicating that disclosures are available by calling the telephone number, such as "call 1-800-000-0000 for details about credit costs and terms."

**Subpart C--Closed-End Credit**

   16. In Supplement I to Part 226, under *Section 226.17--General Disclosure Requirements, 17(c) Basis of disclosures and use of estimates, Paragraph 17(c)(1)*, paragraph 17(c)(1)-8 is revised, and under *17(f) Early disclosures*, paragraph 17(f)-4 is revised, to read as follows:

*Section 226.17--General Disclosure Requirements*

73 FR 44522, *

\* \* \* \* \*

*17(c) Basis of disclosures and use of estimates.*

\* \* \* \* \*

*Paragraph 17(c)(1).*

\* \* \* \* \*

8. *Basis of disclosures in variable-rate transactions.* The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosures only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the disclosures on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer   [*44607]   buydown, or a discounted or premium rate, disclosures should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to § 226.19(a)(2) for a discussion of the redisclosure in certain mortgage transactions with a variable-rate feature.)

\* \* \* \* \*

*17(f) Early disclosures.*

\* \* \* \* \*

4. *Special rules.* In mortgage transactions subject to § 226.19, the creditor must redisclose if, between the delivery of the required early disclosures and consummation, the annual percentage rate changes by more than a stated tolerance. When subsequent events occur after consummation, new disclosures are required only if there is a refinancing or an assumption within the meaning of § 226.20.

\* \* \* \* \*

17. In Supplement I to Part 226, under *Section 226.19--Certain Residential Mortgage and Variable-Rate Transactions*, the heading is revised, heading *19(a)(1) Time of disclosure* is redesignated as heading *19(a)(1)(i) Time of disclosure*, paragraphs 19(a)(1)(i)-1 and 19(a)(1)(i)-5 are revised, new heading *19(a)(1)(ii) Imposition of fees* and new paragraphs 19(a)(1)(ii)-1 through 19(a)(1)(ii)-3 are added, and new heading *19(a)(1)(iii) Exception to fee restriction* and new paragraph 19(a)(1)(iii)-1 are added, to read as follows:

*Section 226.19--Certain Mortgage and Variable-Rate Transactions*

*19(a)(1)(i) Time of disclosure.*

1. *Coverage.* This section requires early disclosure of credit terms in mortgage transactions that are secured by a consumer's principal dwelling and also subject to the Real Estate Settlement Procedures Act (RESPA) and its implementing Regulation X, administered by the Department of Housing and Urban Development (HUD). To be covered by § 226.19, a transaction must be a federally related mortgage loan under RESPA. "Federally related mortgage loan" is defined under RESPA (12 U.S.C. 2602) and Regulation X (24 CFR 3500.2), and is subject to any interpretations by HUD. RESPA coverage includes such transactions as loans to purchase dwellings, refinancings of loans secured by dwellings, and subordinate-lien home-equity loans, among others. Although RESPA coverage relates to any dwelling, § 226.19(a) applies to such transactions only if they are secured by a consumer's principal dwelling. Also, home equity lines of credit subject to § 226.5b are not covered by § 226.19(a). For guidance on the applicability of the Board's revisions to § 226.19(a) published on July 30, 2008, see comment 1(d)(5)-1

\* \* \* \* \*

5. *Itemization of amount financed.* In many mortgage transactions, the itemization of the amount financed required by § 226.18(c) will contain items, such as origination fees or points, that also must be disclosed as part of the good faith estimates of settlement costs required under RESPA. Creditors furnishing the RESPA good faith estimates need not give consumers any itemization of the amount financed, either with the disclosures provided within three days after application or with the disclosures given at consummation or settlement.

*19(a)(1)(ii) Imposition of fees.*

1. *Timing of fees.* The consumer must receive the disclosures required by this section before paying or incurring any fee imposed by a creditor or other person in connection with the consumer's application for a mortgage transaction that is subject to § 226.19(a)(1)(i), except as provided in § 226.19(a)(1)(iii). If the creditor delivers the disclosures to the consumer in person, a fee may be imposed anytime after delivery. If the creditor places the disclosures in the mail, the creditor may impose a fee after the consumer receives the disclosures or, in all cases, after midnight on the third business day following mailing of the disclosures. For purposes of § 226.19(a)(1)(ii), the term "business day" means all calendar days except Sundays and legal public holidays referred to in § 226.2(a)(6). *See* Comment 2(a)(6)-2. For example, assuming that there are no intervening legal public holidays, a creditor that receives the consumer's written application on Monday and mails the early mortgage loan disclosure on Tuesday may impose a fee on the consumer after midnight on Friday.

2. *Fees restricted.* A creditor or other person may not impose any fee, such as for an appraisal, underwriting, or broker services, until the consumer has received the disclosures required by § 226.19(a)(1)(i). The only exception to the fee restriction allows the creditor or other person to impose a *bona fide* and reasonable fee for obtaining a consumer's credit history, such as for a credit report(s).

3. *Collection of fees.* A creditor complies with § 226.19(a)(1)(ii) if--

i. The creditor receives a consumer's written application directly from the consumer and does not collect any fee, other than a fee for obtaining a consumer's credit history, until the consumer receives the early mortgage loan disclosure.

ii. A third party submits a consumer's written application to a creditor and both the creditor and third party do not collect any fee, other than a fee for obtaining a consumer's credit history, until the consumer receives the early mortgage loan disclosure from the creditor.

iii. A third party submits a consumer's written application to a second creditor following a prior creditor's denial of an application made by the same consumer (or following the consumer's withdrawal), and, if a fee already has been assessed, the new creditor or third party does not collect or impose any additional fee until the consumer receives an early mortgage loan disclosure from the new creditor.

*19(a)(1)(iii) Exception to fee restriction.*

1. *Requirements.* A creditor or other person may impose a fee before the consumer receives the required disclosures if it is for obtaining the consumer's credit history, such as by purchasing a credit report(s) on the consumer. The fee also must be *bona fide* and reasonable in amount. For example, a creditor may collect a fee for obtaining a credit report(s) if it is in the creditor's ordinary course of business to obtain a credit report(s). If the criteria in § 226.19(a)(1)(iii) are met, the creditor may describe or refer to this fee, for example, as an "application fee."

\* \* \* \* \*

18. In Supplement I to Part 226, under *Section 226.24--Advertising*, paragraph 24-1 is revised; heading *24(d) Catalogs or other multiple-page advertisements; electronic advertisements* and paragraphs 24(d)-1 through 24(d)-4 are redesignated as heading *24(e) Catalogs or other multiple-page advertisements; electronic advertisements* and paragraphs 24(e)-1 through 24(e)-4, respectively; headings *24(c) Advertisements of terms that require additional disclosures, Paragraph 24(c)(1)*, and *Paragraph 24(c)(2)* and paragraphs 24(c)-1, 24(c)(1)-1 through 24(c)(1)-4, and 24(c)(2)-1 through 24(c)(2)-4 are redesignated as headings 24(d) *Advertisements of terms that require additional disclosures, Paragraph 24(d)(1)*, and *Paragraph 24(d)(2)* and paragraphs 24(d)-1, 24(d)(1)-1 through 24(d)(1)-4, and 24(d)(2)-1 through 24(d)(2)-4, respectively; heading *24(b) Advertisement of rate of finance charge* and paragraphs 24(b)-1 through 24(b)-5 are redesignated as heading *24(c) Advertisement of rate of finance charge* and paragraphs 24(c)-1 through 24(c)-5, respectively; new heading *24(b) Clear and conspicuous standard* and new paragraphs 24(b)-1 through 24(b)-5 are added; newly designated paragraphs 24(c)-2 and 24(c)-3 are revised, newly designated paragraph 24(c)-4 is re-