IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re BRIAN A. KITTS,<br><br>    Debtor.<br>--------------------------------------------------------<br>**J. KEVIN BIRD, Chapter 7 TRUSTEE,**<br><br>    Plaintiff/Appellant/Cross-Appellee,<br><br>    vs.<br><br>**WINTERFOX, LLC**,<br><br>    Defendant/Appellee/Cross-Appellant. | **ORDER**<br><br>**ON APPEAL FROM**<br><br>**BANKRUPTCY COURT**<br><br>**District Court Case No. 2:10-CV-111-TC**<br><br>Bankruptcy Case No. 05-27158 JAB (Ch. 7)<br><br>Adversary Proceeding No. 06-02250 |

This matter comes before the court on consolidated appeals[1] by Plaintiff/Appellant J. Kevin Bird, Chapter 7 Bankruptcy Trustee, of decisions made by the United States Bankruptcy Court for the District of Utah during resolution of an adversary proceeding filed in the matter of Debtor Brian A. Kitts. For the reasons set forth below, the bankruptcy court's decision is AFFIRMED IN PART and REVERSED IN PART.

## BACKGROUND

**Procedural Background**

The Debtor, Brian Kitts, filed for Chapter 11 bankruptcy in 2005. His Chapter 11

---

[1]The appeals, originally filed in two separate cases, were consolidated into the matter now before the court. (See Order to Consolidate (Docket No. 17) (consolidating 2:10-cv-158 with above-captioned matter).)

bankruptcy was converted to a Chapter 7 bankruptcy, and J. Kevin Bird was appointed as the Chapter 7 Trustee for Mr. Kitts's estate.

The Trustee took over prosecution of Mr. Kitts's adversary proceeding against Winterfox LLC, a lender and creditor of Mr. Kitts. In the adversary proceeding, the Trustee, who was substituted as plaintiff, brought claims against Winterfox under section 1640 of the federal Truth In Lending Act (TILA), 15 U.S.C. § 1601 *et seq*. In the adversary proceeding, the Trustee contends that Winterfox violated certain disclosure requirements under TILA concerning two short-term, high-interest loans totaling approximately $1.39 million, which Winterfox made to Mr. Kitts and which were secured by a house in Park City, Utah.[2] The Trustee asserts that the bankruptcy estate is entitled to actual damages, statutory damages, attorney's fees, and return of finance charges.

Winterfox asserts, in its defense, that TILA did not apply to the loan transaction because the real property was not a consumer's personal dwelling but instead a corporate asset owned by Mr. Kitts's business, Sun Peak Holdings, Inc., and that Mr. Kitts obtained the two loans primarily for business purposes.

Before trial, the Trustee obtained permission to file an amended complaint asserting new

---

[2]The parties do not dispute that—if TILA applies to the loan transaction—Winterfox violated the statute by failing to make certain disclosures to Mr. Kitts. (See Bankr. Ct. Jan. 8, 2010 Findings of Fact & Conclusions of Law (Docket No. 1-1) at 15 ¶ 90 ("Winterfox has stipulated and agreed that for the purposes of this trial that the TILA Disclosures were not sufficient to meet the requirements of TILA.").) Here, the court faces the threshold issue of whether the TILA disclosure requirements applied to the loan transaction between Winterfox and Mr. Kitts.

2

claims under the Utah Residential Mortgage Practices Act[3] (URMPA).[4] Although the proposed amended complaint was attached to the proposed order served on Winterfox,[5] the Trustee failed to file it until the motion-filing deadline arrived. Winterfox moved to strike the amended complaint, contending that allowing the URMPA claims would prejudice Winterfox because it would not be able to file a motion for summary judgment on the new claims. The bankruptcy judge struck the amended complaint, a decision the Trustee characterizes as a sanction.[6]

After a three-day bench trial, the bankruptcy court issued Findings of Fact and Conclusions of Law and dismissed the Trustee's TILA claims based on the finding that TILA did not apply to Winterfox's loan transaction with Mr. Kitts (i.e., Winterfox did not meet the definition of "creditor" under TILA). The bankruptcy court also denied Winterfox's request for attorneys' fees. (See Jan. 8, 2010 Bankr. Ct. Order (Findings of Fact & Conclusions of Law) (Docket No. 1-1).)

The Trustee appeals: (1) the decision striking his amended complaint with the URMPA claims in it; and (2) the decision dismissing the adversary proceeding (i.e., the TILA claims).[7]

---

[3] Utah Code Ann. § 61-2c-101 *et seq.*

[4] (See Apr. 7, 2009 Bankr. Ct. Order (allowing Trustee to add new claims in amended complaint) (Appellant App. at 252).)

[5] Winterfox approved the proposed order as to form and the bankruptcy judge signed it.

[6] (See June 4, 2009 Bankr. Ct. Order (striking amended complaint) (Appellant App. 132-145).)

[7] The Trustee also originally appealed the bankruptcy court's decision striking his objection to Winterfox's Bankruptcy Claim on res judicata grounds, but he voluntarily dismissed that appeal on July 8, 2010. (See Notice of Dismissal (Docket No. 40).) Consequently, Appellee Winterfox, LLC's Motion to Supplement the Record on Appeal (Docket No. 18) (which addresses the record relating to the Trustee's appeal of the order striking his objection to

3

Winterfox cross-appeals on one issue: it challenges the bankruptcy court's factual finding that proceeds of the loan from Winterfox were primarily attributable to personal, household, or family purposes rather than corporate or business purposes. Specifically, Winterfox contends that the Park City house was a corporate asset rather than Mr. Kitts's personal residence and so the Winterfox loan transaction was not subject to the requirements of TILA under 15 U.S.C. § 1603(1) (exempting "credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes"); see also 15 U.S.C. § 1602(h) (defining consumer transaction as "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes").

**Factual Background**

In the fall of 2004, Mr. Kitts was facing the loss of his family's home in Park City, Utah, to three foreclosing lien creditors. To stave off foreclosure, Mr. Kitts employed Michael Falk to find him a new loan to refinance the existing debt. In November or December 2004, Mr. Falk contacted Aaron Olivarez, who was a licensed agent employed by Citiwide Mortgage Services (a mortgage brokerage firm), to determine whether Mr. Olivarez worked with a lender that could give Mr. Kitts a loan. Mr. Olivarez proposed Winterfox as a potential lender.

To evaluate the lending opportunity for Winterfox, Mr. Olivarez reviewed a packet of information given to him by Mr. Falk. This packet included a title report, a credit report, an appraisal, and a uniform loan application that had been filled out by Mr. Kitts. Mr. Olivarez

---

Winterfox's claim) is moot and is hereby DENIED.

further conducted an inspection of the home to verify its value. Ultimately, Mr. Olivarez brought the opportunity to Winterfox to issue the loan, and Winterfox agreed to take it.

On December 8, 2004, Mr. Kitts entered into a $1.35 million, short-term loan agreement with Winterfox evidenced by a written agreement and a note and secured by a first position trust deed on the home. This loan, however, was insufficient to payoff Mr. Kitts's existing obligations. So Winterfox agreed to make another short-term loan to Mr. Kitts for an additional sum to complete the amount needed to make up the shortfall. This second loan was made between December 23 and December 31, 2004, in the amount of $39,603.47 and was evidenced by a second note and secured by a second position trust deed on the home.

Along with examining Mr. Kitts's loan application packet, determining the value of the home, and recommending that Winterfox consider loaning the money, Mr. Olivarez also (1) negotiated the substantive terms of the loans for Winterfox, (2) drafted the loan agreement for Winterfox, (3) either drafted or caused the drafting of the notes and trust deeds for Winterfox, (4) followed up with the title company regarding liens on the Debtor's home, (5) "underwrote" and "processed" the loans for Winterfox, and (6) attended the closings at the title company for Winterfox and, afterward, called Winterfox to ensure the funding of the loans.

Mr. Kitts paid a total of $87,500 in fees designated as "loan origination fees" in connection with the loans. From this amount, Winterfox received $62,500, and Mr. Olivarez and Mr. Falk each received $12,500.

Mr. Kitts defaulted on the loans, and Winterfox threatened to record a deed in lieu of foreclosure that had been given up front in connection with the loans. In response, on May 4, 2005, Mr. Kitts filed a voluntary Chapter 11 petition.

On September 2, 2005, Winterfox sought to enforce the mortgage loans in Mr. Kitts's bankruptcy case by filing a proof of claim in the amount of $1,525,942 plus continuing post-petition interest, costs, and attorney fees as an oversecured, secured creditor. Winterfox filed amended proofs of claim for the same amounts on January 22, 2008, and July 28, 2008.

On April 26, 2006, Mr. Kitts initiated this adversary proceeding by filing a complaint seeking damages resulting from Winterfox's violation of TILA. On December 11, 2006, Mr. Kitts's Chapter 11 case was converted to Chapter 7, and the Trustee was appointed. On April 24, 2007, the Trustee was substituted for Mr. Kitts as plaintiff in this action.

The bankruptcy court initially set trial for February 2009. Upon the assigned judge's retirement and reassignment of the case to another bankruptcy judge, Winterfox sought relief from the setting and moved for an extension of the scheduling order to permit it to file a motion for summary judgment. The bankruptcy court granted Winterfox's motion and entered a new scheduling order.

On March 6, 2009, the Trustee filed a timely motion for leave to file an amended and supplemental complaint seeking to (1) add Winterfox's assignees of the notes as parties, (2) add a new theory for affirmative recovery under the URMPA arising from Winterfox's failure to hold a license before engaging in the business of residential mortgage lending and for using an illegal deed in lieu of foreclosure; and (3) establish that the Trustee sought relief under TILA and the URMPA in the form of an objection to Winterfox's proof of claim as well as in the form of affirmative relief for damages.

At a hearing on the Trustee's motion to amend on March 30, 2009, the bankruptcy court denied the Trustee's request to add parties but granted the motion with respect to

6

the Trustee's request to add a claim under the URMPA and to object to Winterfox's proof of claim.

On April 2, 2009, three days after the bankruptcy court's ruling, the Trustee emailed copies of the proposed order and the amended complaint to Winterfox's counsel seeking approval of the language and form of the amended complaint. Winterfox's counsel responded that the amended complaint was fine and suggested only one change to the proposed order. The Trustee incorporated Winterfox's suggested change to the proposed order and submitted the proposed order to the bankruptcy court.

The Trustee attached a copy of the amended complaint to the proposed order. Winterfox, by its counsel, approved the proposed order as to form, and, on April 8, 2009, the bankruptcy court signed the proposed order.

Although the amended complaint was on record as an exhibit to the order granting leave to amend, the Trustee failed to separately file and serve it until May 22, 2009 - which coincided with the dispositive motion deadline. Winterfox moved to strike the amended complaint, claiming that the delay in filing deprived it of the opportunity to file a dispositive motion on the new claims raised in the amended complaint. At the time of the hearing, the parties had already filed competing summary judgment motions, and the hearing on those motions was set for July 28, 2009 (57 days away). To address the prejudice claimed by Winterfox and still retain the summary judgment hearing date, the Trustee suggested that Winterfox be allowed an extension to file a motion addressing the new matters and that the Trustee would respond in eight to ten days. The bankruptcy court rejected this suggestion and struck the Trustee's amended complaint, making the following findings on the record:

7

> The Court granted the motion to file the Amended Complaint, but apparently, as a result of mistake, the actual Complaint was not timely filed and - or was filed so late that there could not be a Motion For Summary Judgment filed on the amended Claims For Relief in the Complaint. . . .
>
> . . . I'm going to file - find that there is - we have a deadline in this case that is ancient and should have been tried by now . . . .
>
> I think that there's actual prejudice to the Defendant of not having the Amended Complaint on file. If I allowed the Amended Complaint to - or deny the Motion To Strike, we would have to extend the scheduling, and I'm simply not going to do that in this case. Therefore, I'm going to grant the Motion to Strike the Plaintiff's Amended Complaint.

(June 1, 2009 Hr'g Tr. at 27-28.)

Based on the order striking the amended complaint, the trial in December 2009 was limited to the TILA claims alleged in the original complaint. After taking the matter under advisement, the bankruptcy court dismissed the action. The basis for dismissal was that Winterfox was not a "creditor" subject to TILA because it did not "originate" its two loans to Mr. Kitts and also because it did originate any loan to Mr. Kitts "through a mortgage broker."

The Trustee appeals the decisions.

## ANALYSIS

**Jurisdiction and Standard of Review**

A district court has jurisdiction to review a final bankruptcy court decision under 28 U.S.C. § 158(a). The district court, acting as a court of appeal, applies the same standards of review that govern appellate review in other cases. In re Hodes, 402 F.3d 1005, 1008 (10th Cir. 2005).

On appeal, the court reviews findings of fact for clear error. Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 829 (10th Cir. 2005). A finding is clearly erroneous when,

although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 394-95 (1948). Failure to consider or give proper weight or significance to relevant evidence, however, presents a question of law. Harvey ex rel. Blankenbaker v. United Transp. Union, 878 F.2d 1235, 1244 (10th Cir. 1989).

Questions of law are subject to *de novo* review. Hodes, 402 F.3d at 1008. Questions of statutory interpretation are questions of law. Dalton v. IRS, 77 F.3d 1297, 1299 (10th Cir. 1996). Where there are no factual disputes and the issues on appeal pertain to the proper application of statutes and the interpretation of case law, review is *de novo*. In re: Midkiff, 342 F.3d 1194, 1197 (10th Cir. 2003).

The dismissal of a party's claims as a sanction for the party's conduct is reviewed under an abuse of discretion standard. Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). A trial court abuses its discretion if its decision is arbitrary, capricious, whimsical, or manifestly unreasonable. Orr v. City of Albuquerque, 417 F.3d 1144, 1153 (10th Cir. 2005).

**Issues on Appeal**

First, the court must determine whether the bankruptcy court's factual finding that the loans were used primarily for personal, not business, purposes and that the Park City house was a primary residence for the Kitts, not a corporate asset of Mr. Kitts's company. Second, the court must determine whether the bankruptcy court correctly interpreted the definitions of "mortgage broker" and "originate" under TILA. Third, the court must determine whether the bankruptcy court abused its discretion in striking the amended complaint. Fourth, the court must determine whether the bankruptcy court properly denied Winterfox's request for attorneys' fees in light of

9

attorneys' fee provision in the loan agreement and two promissory notes.

**The Bankruptcy Court's Factual Findings are Not Clearly Erroneous.**

Winterfox challenges the bankruptcy court's factual finding that the loan proceeds were used primarily for personal expenses and that the Park City house was the Mr. Kitts's primary residence. Based on the record, and the bankruptcy court's evaluation of witness credibility, the court concludes that the factual finding about the status of the loan proceeds and the house as a personal residence was not clearly erroneous.

**TILA Applies to the Loan Transaction.**

If Winterfox, a mortgage lender, is a "creditor" as defined by TILA, then the loan transaction is subject to TILA disclosure requirements. See 15 U.S.C. § 1602(f).

A mortgage lender is "creditor" if it (1) "*originates*" two or more consumer loans that are high-cost mortgages within a twelve-month period, **or** (2) originates even one consumer loan that is a high-cost mortgage through a "*mortgage broker*." 15 U.S.C. § 1602(f). On appeal, the Trustee contends that the bankruptcy court erroneously determined that Winterfox was not a "creditor" because it did not "originate" the two loans it made to Mr. Kitts[8] and, alternatively, because Winterfox did not originate either of the loans through a "mortgage broker" as defined by TILA. The court holds that the bankruptcy court's interpretation of TILA is incorrect as a matter of law.

---

[8]The bankruptcy court did not determine whether one or both of the mortgage loans at issue were high-cost mortgages, because it reached the threshold question first.

**Winterfox "Originated" Both Loans**.

TILA does not articulate what it means to "originate" a loan. Accordingly, the meaning of the TILA statute must be derived by giving each word its plain meaning unless the literal application is at odds with the intent of the legislation, the literal application would produce an absurd result, or the statutory language is ambiguous. But the meaning the bankruptcy court gave to "originate" (by using an internet dictionary definition giving the meaning of originate as "to give origin or rise to; initiate; [or] invent") would produce an illogical result and is at odds with Congress' legislative intent.

Focusing on the "initiate" portion of the internet dictionary definition, the bankruptcy court held that Winterfox did not originate the loans because Mr. Kitts (through his agent, Mr. Falk) first contacted Winterfox through its agent, Mr. Olivarez, for a loan. According to the bankruptcy court, it follows that Mr. Kitts "initiated" and "originated" the loan. Although the bankruptcy court correctly looked for the plain meaning of "originate" in a dictionary resource, the resource it relied on resulted in an unworkable definition of "originate." The bankruptcy court's definition of "originate," taken to its logical conclusion, would lead to absurd results contrary to the intent and purpose of TILA

Within TILA, the term "originate" is used in the context of mortgage lending. The relevant inquiry should have been the plain meaning of "originate" in that context. Nken v. Holder, 129 S. Ct. 1749, 1756 (2009) ("[S]tatutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole"); King v. St. Vincent Hosp., 502 U.S. 215, 221 (1991) (holding that "a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context").

11

Definitions in the mortgage lending context define "origination" as the act of "making or issuing" a loan. For example, government sources in the mortgage lending arena indicate that to "originate" a loan is to "create" the loan. For example, the implementing regulations for the Real Estate Settlement Procedures Act (RESPA) defines "origination services" as services incident to the "creation" of a mortgage loan: "any service involved in the creation of a mortgage loan, including but not limited to the taking of the loan application, loan processing, and the underwriting and funding of a loan, and the processing and administrative services required to perform these functions." 24 C.F.R. § 3500.2.

But even more persuasive is TILA's legislative history. When Congress discussed what persons it intended to be covered by TILA, it used the phrase "making a high cost mortgage" interchangeably with "originating a high cost mortgage": "For High Cost Mortgages, the Committee has extended coverage to anyone making a high cost mortgage through a broker and anyone who makes more than one High Cost Mortgage in a twelve month period." S. Rep. No. 103-169, at 25 (1993), as reprinted in 1994 U.S.C.C.A.N. 1881, 1909 (emphasis added) (cited in Cetto v. LaSalle Bank Nat'l Ass'n, 518 F.3d 263, 271 (4th Cir. 2008)) (emphasis added).)

The bankruptcy court's determination that a lender does not "originate" a loan if the borrower is the first to initiate contact is not supported by case law or any source defining terms within the context of mortgage lending. But most importantly, the bankruptcy court's interpretation would deny protections to borrowers who are the first to contact a lender when seeking a loan (i.e., a great percentage of consumers). That would be contrary to TILA, a remedial statute that must be liberally construed in favor of the consumer. Johnson v. Riddle, 305 F.3d 1107, 1117 (10th Cir. 2002).

When the meaning of "originate" is construed within the appropriate context, consistent with the legislation in which it appears, and in a manner that makes sense, the court finds that Winterfox "originated" the loans it made to Mr. Kitts because it issued, underwrote, processed, and funded them.[9]

**Winterfox Originated At Least One Loan Through a Mortgage Broker.**

In the alternative, Winterfox is a "creditor" because it originated a high-cost mortgage through a mortgage broker.

Under 15 U.S.C. § 1602(aa), a high-cost mortgage must have an annual percentage rate that exceeds by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for credit is received by the creditor. At trial, the Trustee's expert witness testified that depending on whether the notes were due on January 24, 2005 or February 21, 2005, the annual percentage rate of the first loan was between 66.66% and 72.58%. He further testified that the annual percentage rate of the second loan was between 12% and 47.10%. The bankruptcy court took judicial notice of the fact that Treasury yields were between 1% and 2% when the loans were made. Accordingly, the record supports the conclusion that at least one of the loans was a high-cost mortgage.

The term "mortgage broker" was not a defined term under TILA when the loans were made in December 2004. But, in October 2009, it became a defined term in Regulation Z, which is the implementing regulation for TILA. See 12 C.F.R. § 226.36, added at 73 Fed. Reg. 44522,

---

[9] Indeed, it was paid $62,500 of the $87,500 "loan origination" fee.

44604 (July 30, 2008) (effective Oct. 1, 2009). "Mortgage broker" is now expressly defined under TILA as a person, other than an employee of a creditor, who, for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person. 12 C.F.R. § 226.36.

This definition, although new to TILA, is consistent with how courts defined and applied the term before its adoption. For example, in In re Dukes, 24 B.R. 404 (Bankr. E.D. Mich. 1982), the question was whether a fee charged by a mortgage company should be construed as a "broker's fee" under TILA. Because the mortgage company "obtain[ed] loans for its clients from lenders" and was "an arranger for the extension of consumer credit," the court determined, as a matter of law, that the mortgage company was a "mortgage broker" and that the fee charged in the transaction at issue was a "broker's fee." Id. at 416.

Similarly, in Hodges v. Swafford, 863 N.E.2d 881 (Ind. Ct. App. 2007),[10] a broker, who worked for a mortgage company, was contacted by a borrower looking for a loan. The borrower did not qualify for any loans available from the mortgage company, so the broker brought the lending opportunity to her brother. Despite her argument that she and her brother "were not acting as a mortgage broker and creditor, but rather as sister and brother doing a personal favor for [the borrower] to save his childhood home," id. at 888, the court found that she was a "mortgage broker" because she "brought the parties together, acted as their liaison prior to the closing, and prepared the documents necessary to complete the transactions." Id. Referencing either the new definition in TILA or the definition contained in pre-Regulation Z case law, Mr.

---

[10]As amended on rehearing, 868 N.E.2d 1179 (Ind. Ct. App. 2007).

Olivarez was a mortgage broker in the loan transactions at issue. He was not an employee of Winterfox. He brought the lending opportunity to Winterfox and negotiated the terms of the loans for Winterfox. He acted as Winterfox's liaison. He drafted the loan documents and/or oversaw their drafting. And he was paid a $12,500 commission for his services from the loan proceeds.

Again, the bankruptcy court looked at a dictionary definition to determine the plain meaning of the term "mortgage broker." And by reference to several sources (including Black's Law Dictionary and an internet dictionary site), the bankruptcy court determined that the term "mortgage broker" means "an individual or organization that markets mortgage loans and brings lenders and borrowers together." The bankruptcy court then further parsed the meaning of the phrases in this definition, opining that (1) one who "markets mortgage loans" must be "actively shopping loans" for the benefit of a lender, and (2) one who "brings lenders and borrowers together" must be the first to approach the other party in the loan transaction.

Based on the above, the bankruptcy court determined that Mr. Olivarez did not act as a mortgage broker in connection with the loans because "[h]e was not actively shopping loans for the benefit of Winterfox" and because it was "Falk that approached Olivarez, and it was Falk that brought the parties together."[11] The bankruptcy court further relied on Hodges to reach that conclusion. But the bankruptcy misread Hodges.

Hodges does not, and cannot, stand for the proposition that one must be "actively shopping loans" for the benefit of a lender in order to be a "mortgage broker." The borrower in

---

[11]Findings & Conclusions ¶ 24.

15

Hodges could not get a conventional loan from the mortgage company for which the broker worked. Accordingly, the broker did the borrower a "favor" by arranging a loan from her brother. The facts in Hodges did not indicate that the sister was actively marketing loans for her brother, and the court (which used the same definition of "mortgage broker" from Black's Law Dictionary that the bankruptcy court used here) did not focus on that issue when it held that she was a mortgage broker. Rather, the court's decision was based upon the facts that the sister "brought the parties together, acted as their liaison prior to the closing, and prepared the documents necessary to complete the transaction." 863 N.E. 2d 881, 888 (Ind. Ct. App. 2007), as amended on rehearing, 888 N.E.2d 1179 (Ind. Ct. App. 2007).

Much like the situation in Hodges, Mr. Kitts was looking for a loan to save his home. Mr. Kitts's agent, Mr. FaIk, contacted Mr. Olivarez to see if a loan could be found. Mr. Olivarez worked for a mortgage company, but, rather than brokering a loan to conventional lenders available through that company (presumably because Mr. Kitts would not qualify), Mr. Olivarez brought the opportunity to Winterfox. The evidence at trial was that Winterfox had decided to go into the hard money lending business sometime before the making its loans to Mr. Kitts and had associated with Mr. Olivarez with the objective and intent that Mr. Olivarez find loans for Winterfox to make.[12] The evidence further established that Mr. Olivarez had found several loans for Winterfox around the same time that he brought in the Kitts loan. Moreover, when Mr. Falk asked Mr. Olivarez if he knew a lender that could make a loan to Mr. Kitts, Mr. Olivarez engaged in active marketing for Winterfox when he "proposed Winterfox to Falk as a potential

---

[12] Applt. Appx. at 554 (Tr. 12/1109 sealed testimony of George Bybee at p. 10) and 83-86 (Tr. 12/1109 at pp. 30-31, 33-34).

lender for [Mr. Kitts]." (Findings & Conclusions ¶ 50.) Accordingly, even if a person was required to "actively shop loans" for a lender to be a broker, Mr. Olivarez met that requirement.

As for the bankruptcy court's second proposition that to "bring parties together," the putative mortgage broker must have been the first to initiate contact with the borrower, the facts in Hodges are clear that the borrower was the one who first approached the broker looking for a loan. The bankruptcy court's interpretation of the "mortgage broker" was contrary to law, for such an interpretation is contrary to the intent of TILA and would lead to absurd results.

TILA is to be liberally interpreted in favor of the consumer. Johnson v. Riddle, 305 F.3d 1107, 1117 (10th Cir. 2002). But the bankruptcy court interpreted the term "mortgage broker" narrowly in favor of the lender by requiring not only that mortgage brokers act as the "go-between" for their principals, but that they also must make the initial contact with the borrowers and be actively shopping loans for their lenders. Such a narrow interpretation goes against the clear intent of TILA because it would make high-cost mortgages originated by brokers less likely to be covered by TILA. It would also allow lenders to make high-cost mortgage loans through the services of brokers, who would simply wait for the borrowers to make the initial approach and so evade the requirements of TILA. Borrowers who approach these brokers would be penalized and left without the protections of TILA. Accordingly, the bankruptcy court's decision is contrary to law and is REVERSED.

**Striking Amended Complaint Was Not Abuse of Discretion**

The Trustee appeals the bankruptcy court's order granting Winterfox's motion to strike the Trustee's amended complaint. The court reviews the bankruptcy court's decision under the "abuse of discretion" standard.

Having reviewed the decision (Docket No. 180), the court finds that the bankruptcy court did not abuse its discretion when it struck the Trustee's amended complaint. Even finding that the Trustee's failure to file the amended complaint was inadvertent, the bankruptcy court had the inherent authority to manage its case load and calendar. See, e.g., United States v. Mitchell, 518 F.3d 740, 749-50 (10th Cir. 2008) (noting that "courts have always had the power to dismiss for failure to prosecute . . . in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the [courts'] calendars . . . This authority is an inherent power . . . .") (citing Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)); In re: Moyer, 51 B.R. 302, 307 (Bankr. D. Utah 1985) ("[I]t is clear that the Court has the authority to control and manage its own calendar. . . . This is a necessity in this district whose bankruptcy docket is one of the most crowded in the nation.").

Upon ruling, the bankruptcy court stated,

> . . . I'm going to . . . find that there is – we have a deadline in this case that is ancient and should have been tried by now. And, frankly, it looks to me like the only reasons that it didn't go to trial is because it was impossible to proceed in the case where [the previous judge] had simply thrown up his hands because the parties couldn't get together sufficient to produce a pre-trial order in the case.
>
> In any event, I think that there's actual prejudice to the Defendant of not having the Amended Complaint on file. If I allowed the Amended Complaint to – or deny the Motion To Strike, we would have to extend the scheduling, and I'm simply not going to do that in this case. Therefore, I'm going to grant the Motion To Strike the Plaintiff's Amended Complaint.

(Id. at 27-28.) This was not an abuse of discretion. Accordingly, the bankruptcy court's Order Granting Winterfox, LLC's Motion To Strike the Trustee's Amended Complaint is AFFIRMED.

**Attorney's Fees**

Because the court finds that Winterfox was subject to TILA, Winterfox's appeal of the

bankruptcy court's denial of its request for attorney's fees as the prevailing party is moot. Accordingly, the court does not reach the issue.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1. The court holds that the bankruptcy court's interpretation of "originate" and "mortgage broker" was contrary to law and so that portion of the decision is REVERSED. That portion of the case is REMANDED for further fact finding concerning damages for violation of the federal Truth in Lending Act (TILA) as well as the Trustee's request for attorney's fees.

2. The bankruptcy court's decision to strike the Trustee's amended complaint was not an abuse of discretion and so it is AFFIRMED.

3. Because this court holds that the Trustee is the prevailing party, Winterfox's appeal of the bankruptcy court's denial of its motion for attorney's fees is DISMISSED AS MOOT.

4. Appellee Winterfox, LLC's Motion to Supplement the Record on Appeal (Docket No. 18) is DENIED AS MOOT.

DATED this 26th day of August, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge